STATE v. T. H. SHIPMAN, J. S. SILVERSTEEN, J. H. PICKELSIMER, C. R. McNEELY, A. M. WHITE, S. R. OWEN, W. L. TALLEY AND RALPH FISHER.

(Filed 6 April, 1932.)

1. **Criminal Law I j—Upon motion of nonsuit all the evidence is to be considered in the light most favorable to the State.**

    Upon a motion as of nonsuit in a criminal action only the evidence favorable to the State will be considered, and it will be taken in the light most favorable to the State, and the State is entitled to the benefit of every reasonable intendment thereon and every reasonable inference therefrom. C. S., 4643.

2. **Criminal Law G c—Defendant in criminal action may offer character evidence without being a witness in his own behalf.**

    The right of a defendant in a criminal action to offer evidence of his good character does not depend upon his being a witness for himself.

3. **Criminal Law I f—Consolidation of actions in this case held not error.**

    It is within the sound discretion of the trial court to unite in one action indictments against the officials of a bank and members of the board of county commissioners and its attorney on charges of misapplication of county funds and conspiracy to defraud the county by using county funds to aid the bank, the bank being insolvent.

4. **Jury B b—Order that jury be drawn from body of another county held in court's discretion.**

    The granting of the solicitor's motion that the jury be drawn from the body of another county held within court's discretion. C. S., 473 as amended by chapter 308, Public Laws of 1931.

5. **Criminal Law G i—Expert may testify from examination of books as to solvency of bank on date in question.**

Where the books of the bank are properly identified and introduced in evidence it is competent for an expert accountant, employed by the receiver, to testify from his examination of the books of the bank as to the solvency of the bank on the date in question and as to the amount of the county's deposit at the time, when relevant to the inquiry.

6. **Criminal Law A c—Definition of "wilfully and corruptly" in instructions in this case held without error.**

In a charge upon the trial of county officials for the misapplication of county funds under the provisions of C. S., 4270, the definition that "wilfully and corruptly" meant with "bad faith and without regard to the rights of others and in the interest of such parties for whom the funds were held" is not erroneous under the circumstances of this case.

7. **Conspiracy B a—Definition of criminal conspiracy.**

A criminal conspiracy is the unlawful concurrence of two or more persons in a scheme or agreement to do an unlawful act, or to do a lawful act in an unlawful way or by unlawful means, and does not require the accomplishment of the purpose in contemplation or any overt act in furtherance thereof.

8. **Criminal Law G k—Acts and declarations of conspirator are competent against coconspirators.**

Where upon a trial for conspiracy to defraud, the evidence is sufficient to establish the conspiracy *aliunde* the declarations of the parties thereto, everything said, written or done by any of the conspirators in the execution or furtherance of the common purpose to defraud and forming a part of the *res gestæ* is competent in evidence against them all if made or done before the accomplishment of the common design or before it is finally abandoned, and it is within the discretion of the trial judge to admit such evidence before proof of the fact of conspiracy, subject to be stricken out if the fact of conspiracy is not proven.

9. **Conspiracy B b—Fact of conspiracy may be shown by circumstantial evidence.**

The fact of conspiracy to defraud may be shown by circumstantial evidence; in the reception of such evidence upon the trial great latitude is allowed.

10. **Banks and Banking I a—Definition of "insolvency" of bank.**

Where the solvency of a bank is material on the trial of an indictment for misapplication of county funds and conspiracy to defraud the county, the meaning of the word "insolvent" is correctly defined as being that the bank could not meet its deposit liabilities as they became due in the regular course of its business, or that the actual cash market value of its assets was insufficient to pay its liabilities to depositors and creditors. C. S., 216(a).

11. **Conspiracy B b: Counties B e—Evidence of conspiracy to defraud county and misapplication of county funds held sufficient.**

Upon the trial under an indictment against certain officers of a bank and county commissioners and the county attorney for conspiracy and

STATE *v.* SHIPMAN.

misapplication of the county funds, there was evidence tending to show that the county had funds on deposit in the bank aggregating about half a million dollars and that a county note in a comparatively small amount was shortly to become due, and that pursuant to an agreement among the defendants to aid the bank, the county commissioners passed a resolution and published a statement that the county had to borrow money, and issued the county's note for $100,000, and that the bank purchased the note and sometime later sold it to a third party, and credited the county's account therewith, and that at the time the bank was insolvent, and that the bank and county officials, including the county attorney were heavy borrowers from the bank, is *held*, sufficient with other incriminating evidence, to sustain the charge of the indictment of conspiracy against the bank officials and the charge of conspiracy and misapplication of funds by the commissioners who participated with knowledge of the facts, but not as those who passed the resolution in good faith and without evidence fixing them with knowledge, the burden being upon the State to establish guilt beyond a reasonable doubt.

12. **Criminal Law G d—Exclusion of testimony that defendant had given bank security to protect it from loss on overdraft held not error.**

Where on the trial of a bank president for conspiracy to defraud a county by having the county issue its note and deposit the proceeds in the bank when the bank was insolvent, and evidence is properly admitted that the president was heavily indebted to the bank and had an overdraft in a large amount: *Held*, the exclusion of testimony that the president had given the receiver of the bank a deed of trust on property to secure the bank against loss on account of any sums he might owe the bank is not error.

13. **Criminal Law G t—Foundation for admission of secondary evidence held sufficiently laid in this case.**

On the trial of certain bank officials for conspiracy to defraud a county by having the county issue its notes under false representations that such was necessary to maintain the county schools and roads, and to deposit the proceeds of the notes in the bank when the bank was insolvent, a letter published in the local newspaper purporting to have been written and signed by the bank officials, stating that in the opinion of the writers it was necessary for the county to borrow the money, is *Held*, properly admitted in evidence against the bank officials by whom it was signed, the foundation of such secondary evidence having been sufficiently laid by testimony of the editor of the paper that he had satisfied himself that the letter was written by the bank officials and that he had made a diligent search for the original without finding it.

14. **Criminal Law I g—Instructions in this case held sufficiently full and party desiring elaboration should have made request therefor.**

Where the charge of the trial court in a criminal prosecution fully states the evidence in the case and the law arising thereon, a party desiring more particular elaboration on a specific point should tender a request for special instructions in apt time, and where this has not been done an exception to the charge will not be sustained on appeal.

CONNOR and BROGDEN, JJ., dissenting.

STATE v. SHIPMAN.

APPEAL by defendants from *Sink, J.,* at August Special Criminal Term, 1931, of TRANSYLVANIA. As to Shipman, Silversteen, Pickelsimer, McNeely and Fisher, No error. As to White, Owen and Talley, Reversed.

The defendants were tried under the following bills of indictment, viz.:

"State of North Carolina—Superior Court.
Transylvania County—Spring Term, A.D. 1931.

The jurors for the State upon their oaths do present, that T. H. Shipman, J. S. Silversteen, Ralph Fisher, J. H. Pickelsimer, C. R. McNeely, A. M. White, S. R. Owen and W. L. Talley, late of the county of Transylvania, on 13 September, A.D. 1930, in the county aforesaid, was the agent, consignee, clerk, employee and servant of one Transylvania County, and as such agent, consignee, clerk, employee and servant as aforesaid, was then and there entrusted by the said Transylvania County to receive cash, money, securities, notes and bonds for the said Transylvania County.

And that being so employed and entrusted as aforesaid, the said Shipman, Silversteen, Fisher, Pickelsimer, McNeely, White, Owen and Talley then and there did receive and take into his possession and have under his care for and on account of the said Transylvania County, certain property, to wit, cash, money, securities, notes and bonds of the value of one hundred thousand ($100,000) dollars.

And that afterwards, to wit, on the day and year aforesaid, in the county aforesaid, they, the said defendants above named (then and there being of age of 16 years and more and not an apprentice), knowingly, wilfully, fraudulently, corruptly, unlawfully and feloniously did embezzle and convert and feloniously misapply and did take, make away with and secrete with intent to embezzle and fraudulently misapply cash, money, securities, notes and bonds of the value of the said sum of one hundred thousand ($100,000) dollars so received by them as aforesaid and then and there belonging to the said county of Transylvania, with intent to defraud against the form of the statute in such cases made and provided and against the peace and dignity of the State.

J. WILL PLESS, JR., *Solicitor."*

"The jurors for the State, upon their oaths, do present, that T. H. Shipman, being president of the Brevard Banking Company, a corporation organized and existing under the laws of the State of North Carolina, J. S. Silversteen, being chairman of the board of directors of said Brevard Banking Company, and J. H. Pickelsimer, C. R. McNeely,

A. M. White, S. R. Owen, and W. L. Talley, comprising the board of county commissioners of Transylvania County, North Carolina, and Ralph Fisher, attorney for the said board of county commissioners, at and in Transylvania County, on 13 September, 1930, with force and arms, unlawfully, wilfully, knowingly, designedly, fraudulently and feloniously did combine, conspire and confederate to and with each other by various false pretenses and false representations, to cheat and defraud Transylvania County, and to abstract, misapply, pervert, and misappropriate the money, funds, credits and securities of the said county in the sum of one hundred thousand ($100,000) dollars, by falsely and knowingly representing that the moneys, funds and revenues with which to pay certain obligations and indebtedness and operating expenses of said county, were exhausted and that it was necessary to sell a note of the said county for the sum of one hundred thousand ($100,000) dollars with which to pay the same, whereas, in truth and in fact the said Transylvania County then and there had on deposit and to its credit, in the said Brevard Banking Company, the sum of $575,929.64; the note of said Transylvania County being offered for sale and sold for the benefit of the said Brevard Banking Company, which said Brevard Banking Company was then and there insolvent or in imminent danger of insolvency and was unable to meet the usual requirements of its customers and depositors in the regular course of business; against the peace and dignity of the State.        J. WILL PLESS, JR., *Solicitor."*

The jury returned the following verdict as to the defendants, Shipman, Silversteen and Fisher: "Guilty upon the count of conspiracy with the recommendation of mercy, and not guilty as to misapplication; and as to each and every of the other defendants, guilty as to both counts with the recommendation for mercy."

The jury that convicted the defendants was a special venire from Haywood County, N. C., C. S., 473. Public Laws 1931, chap. 308. The court below sentenced defendants and also disbarred Ralph Fisher, an attorney at law, who was convicted. C. S., 205.

The following stipulation between the State and the defendants was entered into:

"For the purpose of avoiding unnecessary delay in the trial of this cause, it is agreed that at the time of the alleged offense and for six months preceding it,

First: That the Brevard Banking Company was a banking corporation duly organized and existing under the laws of the State of North Carolina, with its principal office in the town of Brevard, North Carolina, and was engaged in general commercial banking business.

Second: T. H. Shipman was the president of the Brevard Banking Company, and acted in that capacity until the date of its closing, 15 December, 1930.

Third: J. S. Silversteen was a director, stockholder and chairman of the board of directors and inactive vice-president of said Brevard Banking Company, and was such until the date of its closing, 15 December, 1930.

Fourth: That Brevard Banking Company was closed and was taken over under the direction of the Banking Department of the North Carolina Corporation Commission for the purpose of liquidation on 15 December, 1930.

Fifth: That W. W. Woodley, Jr., was duly appointed liquidating agent for the purpose of liquidating the said bank, and is at present still acting in that capacity.

Sixth: That J. H. Pickelsimer, C. R. McNeely, A. M. White, S. R. Owen and W. L. Talley, comprised the board of county commissioners of Transylvania County, having been elected in November, 1928, inducted into office on the first Monday in December, 1928, and acting in that capacity from that time until the expiration of their terms of office on 1 December, 1930.

Seventh: That J. H. Pickelsimer was the chairman of the board of county commissioners of Transylvania from December, 1928, until December, 1930.

Eighth: Ralph Fisher was county attorney for the board of county commissioners during its entire term of office.

Ninth: C. R. McNeely was county accountant filling the duties of accountant for Transylvania County, and remained such until 1 December, 1930."

The defendants made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be considered in the opinion.

*Attorney-General Brummitt and Assistant Attorney-General Seawell for the State.*

*Johnson, Smathers & Rollins, T. A. Uzzell, Jr., and Moore Bryson for defendant Thos. H. Shipman.*

*Merrimon, Adams & Adams and W. E. Breese for defendant Jos. S. Silversteen.*

*Lewis Hamlin and Jones & Ward for Ralph Fisher, J. H. Pickelsimer, C. R. McNeely, A. M. White, S. R. Owen and W. L. Talley.*

CLARKSON, J. At the close of the State's evidence, the defendant made motions to dismiss the action or for judgment of nonsuit. C. S., 4643.

We think the motions should have been granted as to White, Owen and Talley. Was there sufficient evidence as to the guilt of the other defendants to have been submitted to the jury? We think so.

"On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. . . . The evidence favorable alone to the State is considered—defendant's evidence is discarded. *S. v. Utley,* 126 N. C., 997. The competency, admissibility and sufficiency of evidence is for the court to determine, the weight, effect and credibility is for the jury. *S. v. Utley, supra; S. v. Blackwelder,* 182 N. C., 899." *S. v. Lawrence,* 196 N. C., at p. 564; *S. v. Casey,* 201 N. C., at p. 203. The evidence in the present case was mostly circumstantial. The defendants introduced no evidence.

The court below instructed the jury: "The court instructs you now that the duty is upon the State to satisfy you beyond a reasonable doubt of the defendants' guilt, and it is the privilege of the defendants and each of them, to offer evidence or not to do so and the fact that they have not gone upon the stand is not to be considered to their prejudice and you will not so consider it as to them." C. S., 1799.

The right of the defendant to offer testimony of his good character does not depend upon his having been examined as a witness in his own behalf. *S. v. Hice,* 117 N. C., 782.

There was evidence, elicited from the State's witnesses, to the effect that the general reputation of the defendants was good. The defendants contend that there was error in the court below in consolidating the two bills of indictment, and in overruling their motion to quash which was made before pleading to the indictments and before the jury was drawn and empaneled. We cannot so hold. The bills of indictment are (1) Under C. S., (4268), 4270; embezzlement and misapplication; (2) for conspiracy. Both bills of indictment charge a felony. The crime of conspiracy at common law was a misdemeanor, it has been changed by statute in certain cases so as to make it a felony. *S. v. Ritter,* 199 N. C., 116. The different indictments are for felonies, and the offenses are so related that we think they can be consolidated. The first follows the language of the statute. *S. v. Leeper,* 146 N. C., 655. We cannot say that the second is bad for duplicity. *S. v. Burnett,* 142 N. C., at p. 580; *S. v. Lewis,* 185 N. C., 640; *S. v. Beal,* 199 N. C., 278, at p. 294. The matter of consolidating these bills of indictment was in the sound discretion of the court below. *S. v. Switzer,* 187 N. C., at p. 94; *S. v. Malpass,* 189 N. C., 349; *S. v. Beal,* 199 N. C., at p. 304; *S. v. Combs,* 200 N. C., at p. 674; *S. v. Smith,* 201 N. C., 494.

The defendants excepted and assigned errors (1) To the motion by the solicitor which was granted that a jury be drawn from a. county other than Transylvania. (2) Upon entering the order that a jury be drawn from the body of the county and not from the jury box of Haywood County, N. C.

This case was tried at August Special Criminal Term, 1931, after the amendment to C. S., 473, by Public Laws 1931, chap. 308. We think C. S., 473 and the amendment gives the discretion to the court below.

The record discloses: "The State now offers to prove by the witness, Miss Laura Clayton, the several books of record of the Brevard Banking Company. The defendants admit that the same are the records of the Brevard Banking Company, but defendants reserve the right to object to the competency of said records."

The exceptions and assignments of error as to the admission of the documentary evidence and also as to the qualification of the State's witness, W. W. Woodley, Jr., a bank officer of 15 years experience, and as liquidating agent of the Brevard Banking Company, after examining and investigating thoroughly the records of the bank, the assets and liabilities of the bank, to express an expert opinion as to the solvency of the Brevard Banking Company, on 13 September, 1930, cannot be sustained. *S. v. Hightower,* 187 N. C., 300; *Loan Assn. v. Davis,* 192 N. C., at p. 112; *S. v. Combs, supra,* at p. 675; *S. v. Rhodes, ante,* 101; *S. v. Brewer, ante,* at p. 193; *S. v. Lancaster, ante,* 204; Wigmore on Evidence (2d ed.), sec. 1234.

The setting: (a) T. H. Shipman was president of the Brevard Banking Company, and J. S. Silversteen was chairman of the board of directors, inactive vice-president, a director and stockholder, and they were such until the closing of the bank on 15 December, 1930, under the supervision of the Banking Department of the North Carolina Corporation Commission. Both were deeply indebted to the bank. (b) J. H. Pickelsimer was the chairman and a member of the board of county commissioners of Transylvania County, N. C., from December, 1928, until 1 December, 1930. He was deeply indebted to the bank. Serving on the board with him during that period were the following members: A. M. White, S. R. Owen, W. T. Talley and C. R. McNeely. (c) C. R. McNeely, was a county commissioner and also county accountant, and was deeply indebted to the bank. (d) Ralph Fisher was county attorney. The bank books and entries were, we think, competently identified. *S. v. Brewer, supra.* The testimony of W. W. Woodley, Jr., expert, showing the total amount of money belonging to Transylvania County, N. C., in its various funds, tabulated from the Brevard Banking Company books, is competent. It was, in part, as follows: "1 July, 1930,

total is $632,940.42; 1 August, 1930, $624,473.90; 1 September, 1930, $627,296.13; 17 September, 1930, $602,249.81; 1 October, 1930, $512,-337.38; 1 November, 1930, $518,178.68; 24 November, 1930, $567,283.28; 28 November, 1930, $472,887.14; 29 November, 1930, $579,187.86; 15 December, 1930, $561,145.86." The amount that was turned over to the new board of county commissioners on 1 December, 1930, by the outgoing board, which are herein named, was $580,464.28. It was in evidence that the Brevard Banking Company was. insolvent when the $100,000 was borrowed by the board of county commissioners and turned over to the bank.

The charges on which the defendants were tried: (a) misapplication, (b) conspiracy. In the charge of the court below is the following:

First. "The State has . . . prosecuted the defendants upon a bill of indictment and charged them with the misapplication of the funds in a . . . bill of indictment. The section of the statute under which the State relies and contends that the defendants are guilty, reads as follows: 4270—'If any officer, agent, or employee of any city, county or incorporated town, or of any penal, charitable, religious or educational institution; or if any person having or holding any moneys or property in trust for any city, county, incorporated town, penal, charitable, religious or educational institution, shall embezzle or otherwise wilfully and corruptly use or misapply the same for any purpose other than that for which such moneys or property is held, such person shall be guilty of felony (and wilfully and corruptly mean in bad faith and without regard of the rights of others and in the interest of such parties for whom the funds are held).'" To the foregoing charge in parentheses, defendants excepted. "And shall be fined and imprisoned in the State's prison in the discretion of the court. If any clerk of the Superior Court or any sheriff, treasurer, register of deeds or other public officer of any county or town of the State shall embezzle or wrongfully convert to his own use, or corruptly use, or shall misapply for any purpose other than that for which the same are held, or shall fail to pay over and deliver to the proper persons entitled to receive the same when lawfully required so to do, any moneys, funds, securities or other property, which such officer shall have received by virtue or color of his office in trust for any person or corporation, such officer shall be guilty of a felony."

Second: "Defendants are indicted upon one bill of indictment charging unlawful conspiracy, and at the outset the court wishes to define to you and explain to you what an unlawful or criminal conspiracy is. In *S. v. Ritter et al.,* 197 N. C., p. 113, in a case that this Court tried, the Supreme Court has given us the following clear and concise statement of a criminal conspiracy that the court now reads to you relative to

the bill charging criminal conspiracy : 'The gist of a criminal conspiracy is the unlawful concurrence of two or more persons in a wicked scheme—the agreement to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means—and it is said that the crime is complete without any overt act having been done to carry out the agreement.' In other words, gentlemen, the consummation of the agreement without any overt act constitutes or may constitute the agreement: If two or more persons conspire to do a wrong, this conspiracy is an act 'rendering the transaction a crime,' without any step taken in pursuance of the conspiracy." Further speaking upon the same subject the Court says: "One who enters into a criminal conspiracy, like one who participates in a lynching, or joins a mob to accomplish some unlawful purpose, forfeits his independence and jeopardizes his liberty, for, by agreeing with another or others to do an unlawful thing, he thereby places his safety and security in the hands of every member of the conspiracy. The acts and declarations of each conspirator, done or uttered in furtherance of the common, illegal design, are admissible in evidence against all. 'Every one who enters into a common purpose or design is equally deemed in law a party to every act which had before been done by the others, and a party to every act which may afterwards be done by any of the others, in furtherance of such common design.' . . . But to make the acts and declarations of one person those of another, or to allow them to operate against another or others, it must appear that there was a common interest or purpose between them and that said acts were done, or said declarations uttered, in furtherance of the common design, or in execution of the conspiracy."

The above is the well settled law on conspiracy in this jurisdiction. *S. v. Wrenn,* 198 N. C., 260; *S. v. Ritter,* 199 N. C., 116; *S. v. Beal,* 199 N. C., 278.

In Jones Commentaries on Evidence (2d ed.), part sec. 943, at pp. 1739-1740, the matter is stated: "Thus where several jointly attempt to accomplish a fraud, the declarations of one of them, made during the progress and the prosecution of the joint undertaking, or accompanying and explaining acts done in furtherance of it, are evidence against the others. When, in fact, a conspiracy of any kind is shown, the acts and declarations of each conspirator, in furtherance of the common object, are admissible against the others. The underlying principle of the rule has been well expressed as follows: 'When an unlawful conspiracy or combination is established, everything said, written, or done by either of the conspirators in the execution or furtherance of the common purpose is deemed to have been said, done, or written by every one of them, and may be proved against each and all of them.' But in such cases

it must first be proved, by other evidence, that a conspiracy existed at the time the declarations were made. Moreover, the mere declarations of one of the alleged conspirators are not competent for this purpose, unless they form a part of the *res gestœ*. Even if a conspiracy is shown aliunde, the declarations of one conspirator are not admissible against the others, if made after the common design is accomplished or abandoned." Greenleaf on Evidence, Vol. 1 (12th ed.), sec. 111, p. 126-7.

In Lockhart's N. C. Handbook of Evidence (2d ed.), sec. 152, at p. 152, citing numerous North Carolina decisions, is the following : "When a conspiracy is established, the declarations and admissions of any one of the conspirators, made while the conspiracy is in existence and in furtherance of the. common design, are admissible against the other conspirators, but any declaration made after the conspiracy is consummated is evidence only against the person making it. In the discretion of the judge the declaration may be admitted before the conspiracy is established, subject to be stricken out if the State fails to establish the conspiracy." *S. v. Brady,* 107 N. C., 822; *Hamilton v. R. R.,* 200 N. C., at p. 556.

We do not think defendants can complain. There was evidence aliunde to establish prima facie, or proper to be laid before the jury, as to the conspiracy, and much of the evidence excluded by the court below was competent against all the defendants, at least on the second bill of indictment. The evidence was circumstantial, and "Great latitude is to be. allowed in the reception of circumstantial evidence." 16 C. J., part sec. 1037, p. 545. *S. v. Ritter,* 199 N. C., at p. 120.

The verdict of the jury as to T. H. Shipman, J. S. Silversteen and Ralph Fisher, was "guilty upon the count of conspiracy with the recommendation of mercy, and not guilty as to misapplication." The evidence was mostly circumstantial, so we consider some of the circumstances against them sufficient to be submitted to the jury as to their guilt.

The charge and evidence in short against the convicted defendants: The charge that T. H. Shipman, as president of Brevard Banking Company, and J. S. Silversteen, chairman of the board of directors, on 13 September, 1930, and J. H. Pickelsimer, who was then chairman of the board of commissioners of Transylvania County, N. C., and its other members, the defendants, and Ralph Fisher, attorney for said board, "With force and arms, unlawfully, wilfully, knowingly, designedly, fraudulently and feloniously did combine, conspire and confederate to and with each other by various false pretenses and false representations, to cheat and defraud Transylvania County, and to abstract, misapply,

pervert and misappropriate the money, funds, credits and securities of the said county in the sum of one hundred thousand ($100,000) dollars, by falsely and knowingly representing that the moneys, funds and revenues with which to pay certain obligations and indebtedness and operating expenses of said county, were exhausted and that it was necessary to sell a note of the said county for the sum of one hundred thousand ($100,000) dollars with which to pay the same; whereas, in truth and in fact the said Transylvania County then and there had on deposit and to its credit, in the said Brevard Banking Company, the sum of $575,929.64; the note of said Transylvania County being offered for sale and sold for the benefit of the said Brevard Banking Company, which said Brevard Banking Company was then and there insolvent or in imminent danger of insolvency and was unable to meet the usual requirements of its customers and depositors in the regular course of business."

T. H. Shipman—charge conspiracy: The evidence (A) was to the effect that the Brevard Banking Company closed on 15 December, 1930, under the direction of the Banking Department of the North Carolina Corporation Commission. That on 13 September, 1930, the Brevard Banking Company, was insolvent. The witness for the State, W. W. Woodley, Jr., the expert, who so testified was cross-examined by defendants in a thorough manner and on this cross-examination he stated: "The opinion I have given is to the fact that this bank was insolvent is not purely a guess nor do I think that it is almost perfectly a guess." The defendant contends, on cross-examination, when asked what he based his opinion as to the insolvency of the bank on, said he meant by the use of that term "if the bank had closed that day it would not have been able to pay off all of its creditors." Defendant contends that this brings the witness' testimony under the condemnation set out in the case of S. v. Hightower, 187 N. C., 311, where the Court uses the expression "not being able to meet its depository liabilities, as they become due in the regular course of business."

N. C. Code of 1931 (Michie), C. S., 216(a), in part: "The term 'insolvency' means: (a) when a bank cannot meet its deposit liabilities as they become due in the regular course of business; (b) when the actual cash market value of its assets is insufficient to pay its liabilities to depositors and creditors," etc. S. v. Brewer, ante, at pp. 189 and 194.

If defendant wanted the expert to elaborate as to insolvency under (b) above, he could have asked him to do so when again no prayer for instruction was requested. Every latitude was allowed defendants on cross-examination. This cannot be held as error. The expert witness had theretofore gone into the questions of insolvency thoroughly and

was then asked: "Q. With that information, following your consideration of the securities and assets of the Brevard Banking Company, and with your knowledge of the value of the various securities, I ask you if you have an opinion satisfactory to yourself as to the solvency of the Brevard Banking Company on 13 September, 1930? Answer: Yes. Q. What is that opinion? A. It was insolvent." In about 90 days the bank was closed as insolvent by the State authorities.

(B) It was contended by the State that Shipman was a large stockholder and deeply indebted to the bank of which he was president, liable directly as maker and indirectly as endorser. The expert, Woodley, testified that the liability of the defendant Shipman on notes as maker was $25,356.80, as endorser $3,159.14, overdrafts $21,703.81, making a total of $50,219.75. Some of the overdrafts were disputed. The expert, Woodley, testified: "He has disputed an item of $15,000. Some other items, some in transit items, charged to him and carried as assets items. They constitute all of this $21,000, all except $275. . . . Mr. Shipman tendered to me in person $5,000 worth of stock in the building and loan as an asset to be held by me against any indebtedness he might owe this bank. The stock was endorsed in blank. Q. Didn't he tender to you in person in the bank a deed of trust on 14 pieces of property in the sum of $15,000, to the end that you might hold it as liquidating agent of the bank to be applied on any indebtedness he might be due the bank? (Objection by the State, sustained, exception and assignment of error by defendant Shipman.)" We think the exception and assignment of error by defendant Shipman cannot be sustained. We think by analogy the following principle applies: "The fact that a party accused of embezzlement intended to restore the property embezzled, or even that the loss has been made good, does not constitute a defense to a criminal prosecution for the embezzlement." *S. v. Summers,* 141 N. C., at pp. 841-2. *S. v. Dunn,* 138 N. C., at p. 674. On 1 September, 1930, Transylvania County had on deposit in the Brevard Banking Company various funds amounting to $627,296.13. Total uncollected current year taxes were $184,998.43.

(C) During the fall of 1930, considerable sums of money were being withdrawn from the Brevard Banking Company, which were on deposit in the bank and the deposits were falling off.

The defendants, Shipman, president, and Silversteen, chairman of the board of directors and vice-president, were seen at the courthouse in conference with some of the defendants, members of the board of commissioners; and the defendants, Shipman and Silversteen, wrote a letter to the board, which was later published in the *Brevard News,* to the following effect:

"COUNTY TO SELL NOTE FOR $100,000, TO CARRY ON SCHOOLS AND ROAD WORK WHILE TAXES ARE BEING COLLECTED.

Gentlemen: It being apparent that the taxes due the county, or a large part of them, are still uncollected and it being necessary for the county commissioners of Transylvania County, N. C., to provide funds for schools and roads, it is our opinion that it is good business for the taxpayers of Transylvania County (as the rate of interest at the present time is cheaper than in several years) for the county commissioners to borrow against uncollected taxes in order to keep the schools and roads going. In borrowing this money as above referred to, it is not increasing the liabilities or indebtedness of the county of Transylvania or will increase or decrease the tax rate for the coming year.

Very truly yours,   Jos. S. Silversteen, Thos. H. Shipman.
Brevard, N. C., 3 September."

Almost coincident with this letter, but dated 1 September, 1930, the defendant McNeely, a county commissioner and county accountant, addressed a communication to the board of commissioners, in which he states that it is necessary to borrow $100,000 for the purpose of paying appropriations made for the current fiscal year, in anticipation of taxes, and, thereupon submits certain tabulations and statements, in order that the statement might comply with the County Fiscal Control Act, Public Laws 1927, chap. 146. Then followed in regular order the various proceedings preliminary to the issue and sale of the $100,000 tax anticipation notes of Transylvania County. All of the defendants, county commissioners, signed the order for the issue of the tax anticipation notes, and the defendant McNeely separately, "in his capacity as county accountant and chief financial officer of Transylvania County." The notes were sold to the Bank of Brevard; Pickelsimer, McNeely, Owen, Talley and White, the county commissioners, signed the resolution which was attested by Ira D. Galloway, register of deeds and ex-officio clerk of the county commissioners. The evidence indicates that Shipman was in the county commissioners' room when the resolution was passed.

Record, in part, of the board of commissioners: "The board of county commissioners met in special advertised meeting on 12 September, 1930, for the purpose of selling notes for $100,000. The following members being present: J. H. Pickelsimer, chairman; C. R. McNeely, W. L. Talley, S. R. Owen and A. M. White. The following orders passed:

No bids, the board recessed until 10 o'clock Wednesday morning, 17 September, 1930.

The board of county commissioners met in a recess meeting on 17 September, 1930.

The following members being present: J. H. Pickelsimer, chairman; C. R. McNeely, W. L. Talley, A. M. White, S. R. Owen. The following orders were passed: On motion of W. L. Talley, seconded by A. M. White and carried, to fix interest rate on $100,000 at 5%. Approved. J. H. Pickelsimer, chairman board of county commissioners."

On 17 September, 1930, the Brevard Banking Company, by Thos. H. Shipman, president, made a written proposal to the commissioners: "For your $100,000 revenue anticipation notes dated 30 July, 1930, in denomination of $10,000 each, numbered one to ten, both inclusive, bearing interest from date thereof at the rate of five per centum per annum payable semiannually on 30 January and 30 July, and all the notes maturing on 30 July, A.D. 1931, both principal and semiannual interest payable at Chase National Bank in city of New York, N. Y.: We will pay one hundred thousand dollars ($100,000) and accrued interest to date of delivery." At the advertised meeting of the board, on 17 September, 1930, all the members being present, the board accepted the bid of the Brevard Banking Company and passed a sale resolution; yet the proceeds of the sale of the notes were not credited to the county by the Brevard Banking Company, until 29 November, 1930, nearly two and a half months later, the amount at that time including interest was $101,625. On 29 November, 1930, most of it was allocated to the several funds of the county. "The school fund on 28 November was $63,397.74; the school fund on 29 November, was $115,294.72; county road fund 28 November, $10,899.55; county road fund 29 November, $19,286.91. . . . Total balance as of 28 November is $472,887.14, and as of 29 November, $579,187.86."

The tax anticipation notes were sold on 17 September, 1930, to the Brevard Banking Company, yet it will be noted that at the time Shipman and Silversteen published the necessity on 3 September, 1930, for the sale of the tax anticipation notes, aggregating $100,000, *"to carry on schools and road work while taxes are being collected,"* there was in the bank on 1 September, $627,296.13 and on 17 September, $602,249.81 belonging to Transylvania County, allocated to schools $79,816.76 and roads $12,594.45. When actually paid for, on 28 November, 1930, the total on deposit in the Brevard Banking Company, was $472,887.14, of which sum there was allocated to the school fund and on hand $63,397.94, and on the road fund $10,899.55. Preceding the publication in the newspaper of the letter, dated 3 September, 1930, was the following "lead": "County sells note for one hundred thousand dollars to carry on the school and road work while taxes are being collected. Transylvania County is borrowing a hundred thousand dollars on a short-term note for the purpose of carrying on the schools, roads and other government expenses," etc.

The evidence shows that the chairman and the board of county commissioners borrowed on tax anticipation notes aggregating $100,000 from the Brevard Banking Company, through its president T. H. Shipman, J. S. Silversteen, chairman of the board of directors; that it was done "to carry on schools and road work, while taxes are being collected," and at the time a large sum of money, as above set forth, was in the Brevard Banking Company, already allocated for those particular purposes, and the bank at the time being insolvent. The evidence tends to show that the insolvency was known to Shipman and Silversteen.

We think there was competent evidence that said Shipman and Silversteen signed and published the above letter and it was their act. James F. Barrett, editor of the *Brevard News,* testified, unobjected to, in part: "I published in my paper of 3 September, a letter appearing on the first page, signed by Joseph S. Silversteen and Thomas H. Shipman and purporting to bear their signatures. I do not know whether I published it from the original delivered to my office or a copy. I satisfied myself that it was a letter of Mr. Shipman and Mr. Silversteen, or I would not have published it." He further testified that he had "made diligent search in the files and among my papers for it and have not found it. . . . The natural supposition is that it with other news copy was destroyed." He further testified that pieces of news copy are kept two or three weeks and unless there is some question "We burn it." The foundation was sufficiently laid for admission of secondary evidence. *Avery v. Stewart,* 134 N. C., 287; *Mahoney v. Osborne,* 189 N. C., 445; *Bank v. Brickhouse,* 193 N. C., 231; *Chair Co. v. Crawford,* 193 N. C., 531.

The record discloses, that, in the presence of the jury, there was some question between the solicitor and the attorney for defendants, in regard to prior notice having been given defendants by the solicitor, to produce the original of the letter purported to be signed by Silversteen and Shipman on 3 September, 1930, before set forth. The solicitor: "Don't you remember that I came into the auditor's room and handed you (Mr. Smathers) and Mr. Jones a notice and said 'Here is a notice I give you gentlemen to produce a letter?'" The court: "You had better serve those notices Mr. Solicitor." The notice was accepted by Mr. Smathers, the attorney for T. H. Shipman, but the record does not disclose what further was done about the matter. The court below said: "We will take this up next week and pass on it." From the record, nothing further seems to have been done about the matter. The original letter which the notice referred to was not introduced in evidence. Immediately following the record discloses that Ira Galloway, register of deeds and ex officio clerk of the board of county commissioners, testi-

fied, in part: "I know the handwriting of Mr. J. S. Silversteen and Mr. T. H. Shipman (in whose handwriting is that letter). The handwriting signed to the letter is that of Thos. H. Shipman and Jos. S. Silversteen. Q. Did you see this letter, the letter published in the newspaper? Answer: Yes." The letter above was then introduced in evidence. This evidence was admitted only against Shipman and Silversteen, to which they excepted and assigned error. From an inspection of the briefs of· these parties, we think this exception and assignment of error is deemed abandoned. Rules of Practice, 200 N. C., p. 831(28). In fact, on cross-examination, the witness Galloway testified: "I saw the original of a letter that was signed by Mr. Shipman and Mr. Silversteen and stated the letter was published in the *Brevard News." Willis v. New Bern,* 191 N. C., at p. 514. The witness Barrett testified: "I got the letter from several offices of the county." These letters seem from the record to have been scattered about. *S. v. Hollingsworth,* 191 N. C., 598, is not applicable.

We think the above evidence, and other facts and circumstances in evidence, sufficient to have been submitted to a jury on the charge of conspiracy, as set forth in the indictment as to T. H. Shipman. The evidence was circumstantial. The court charged, in reference to the defendants: "The State contends that, from all the circumstances that have been offered in evidence you should be satisfied, beyond a reasonable doubt, of the guilt of the defendants and each of them and on each count. Circumstantial evidence may be relied upon for conviction. The courts of North Carolina recognize it, and the court instructs you in regard to circumstantial evidence, the burden is on the State where the State relies on circumstantial evidence to satisfy you beyond a reasonable doubt that the chain of circumstances offered and every link therein points unerringly to the guilt of the defendants and each of them and precludes every reasonable hypothesis of innocence. The laws of North Carolina say where an act may be attributable to two or more motives, one lawful and the other unlawful, that the former must be accepted and not the latter. The defendants come before you with the presumption of innocence in their favor as the court has heretofore charged you, the burden being on the State to satisfy you of the guilt of the defendants, and must so satisfy you, beyond a reasonable doubt. The court instructs you with regard to the circumstances relied on by the State, that if you shall be satisfied beyond a reasonable doubt of the links of the chain of circumstances and if the chain entirely shall satisfy you in like manner of the guilt of the defendants, or any of them, then it would be your duty to return a verdict of guilty; and if the State has failed to satisfy you in like manner of the guilt of the defendants, or any of them, then it would be your duty to return a verdict of (not)

guilty; and if the State has failed to satisfy you in like manner of the guilt of the defendants, or any of them, then it would be your duty to return a verdict of not guilty." We think this charge borne out by the authorities in this jurisdiction. *S. v. Massey,* 86 N. C., 658; *S. v. Wilcox,* 132 N. C., 1120; *S. v. Melton,* 187 N. C., 481; *S. v. Lawrence,* 196 N. C., 562; *S. v. McLeod,* 198 N. C., at p. 653.

The court below charged as to presumption of innocence. *S. v. Herring,* 201 N. C., 543.

J. S. Silversteen—charge conspiracy: The evidence (A) He was director, stockholder, chairman of the board of directors and inactive vice-president of the Brevard Banking Company. Shipman and Silversteen were seen at the courthouse in consultation with members of the board of commissioners, and shortly thereafter two things followed: First, a letter by Shipman and Silversteen to the board of commissioners which, on account of the political effect of the act which they were apparently about to accomplish, was published in the newspaper as an apology for the act, and it may be noted by the officers of the bank and not the board of county commissioners. This letter itself appears to have been a false pretense, but it was acted upon. Immediately a proceeding was begun to sell $100,000 notes of the county, which the defendant Mc-Neely, in his capacity as county accountant, declared to be necessary, and all of the defendant commissioners, signed the proceedings and all of the defendant commissioners the resolution to issue the $100,000.

(B) The $100,000 in notes was sold to the Bank of Brevard. The board of commissioners went out of office on 1 December, and on 15 December following, the bank promptly closed. It was in evidence that during the period of negotiations the bank was insolvent.

(C) Silversteen was a large stockholder in the bank and his liability to the bank as maker was $20,240, as endorser $3,750.

It was also in evidence that Silversteen, on 3 September, 1930, had a checking account of $2,392.23, and certificates of deposit aggregating $8,000 to $10,000.

J. M. Allison, a merchant and director of Brevard Banking Company, the day Ves Ashworth was buried (in August), was asked by Shipman and Silversteen to go to the courthouse with them, and he went. "Q. Who took part in the conversation there, Mr. Allison? Answer: Mr. Shipman or Silversteen, I believe Mr. Shipman told McNeely that Transylvania County had a note that would be due in a short time and he told him it would work a hardship on the people of Transylvania County to pay this note in that short a time, and asked him if he could not give an extension of time. This is all I remember. McNeely said he could not do anything himself, but to take it up with the other commissioners."

(D) At the time of the conversation, there was in the bank over $600,000 of the county's money, on 1 September, 1930, there was $624,-473.90. There are other facts and circumstances in the evidence for the State against Silversteen. In *S. v. Prince*, 182 N. C., at p. 790, this Court said: "We may say generally that evidence should raise more than a mere conjecture as to the existence of the fact to be proved. The legal sufficiency of proof and the moral weight of legally sufficient proof are very distinct in the conception of the law. The first lies within the province of the court, the last within that of the jury. . . . The sufficiency of evidence in law to go to the jury does not depend upon the doctrine of chances." *S. v. Swinson*, 196 N. C., at p. 103. A verdict cannot rest upon a scintilla of evidence or on mere suspicion, guess, surmise, speculation or conjecture. We think the evidence against Silversteen was sufficient to have been submitted to a jury.

Ralph Fisher—charge conspiracy: The evidence (A) He was county attorney, a position of high trust. The State introduced a bill of the defendant, Ralph Fisher, against Transylvania County, dated 29 November, 1930, for balance due on abstracting and removing tax scrolls for the years 1922-23-24-25-26-27, for $4,460. Also a bill in favor of Ralph Fisher against Transylvania County for partial payment for services on tax suits for the years 1922 to 1927, inclusive, for $4,000. The State offered checks, one for $4,000 and one for $4,460, showing the bills had been paid.

On 29 November, 1930, the day one of the bills was dated, the $101,625—the $100,000 and interest—was allocated to the several county funds in the Brevard Banking Company, although the $100,000 in tax anticipation notes were sold by the commissioners to the bank on 17 September, 1930.

(B) A new board of county commissioners had been elected and were to take office on the first Monday in December, 1930. The evidence tended to show that the bills were incorrect in many particulars. This $8,460 was paid just before the board he was attorney for went out of office. When the bank closed 15 December, 1930, his deposit amounted to $313.05.

(C) Jerry Jerome, a witness for the State, testified, in part: "Mr. Fisher was in the office one morning and I asked him why he had borrowed the $100,000 and he said that he and Pickelsimer and McNeely went to the bank to withdraw $75,000 or $100,000 and Mr. Shipman called him back into the back part of the bank and told them if they withdrew that amount of money the bank would have to close its doors. At the beginning of the conversation I asked him why they borrowed the $100,000 and that is what he told me. Q. State if at any time during

the last fall, you saw Mr. Fisher with some money? Answer: I did not see any actual cash. Mr. Fisher and I had a conversation and he made a motion with his hand to his breast pocket, and said that was where he kept his money. Q. When was that, with reference to when the bank closed? Answer: Before the bank closed. Q. How long before? Answer: It was sometime after the Central Bank closed and before our bank closed. That was when he made the motion to the breast pocket—that was between the time the Central Bank closed and the time this bank closed. The Brevard Bank was open at the time. I had this conversation with Fisher after the bank closed. I judge he told me it was in September he went there. To the best of my recollection, it was before the 15th. . . . At the time of these conversations Mr. Fisher was making bitter remarks against Shipman and Silversteen and he said he would not do anything in the world to help the bank; that was what he said. He made this remark at the time that he referred to having been at the bank. It was all in one conversation."

(D) E. F. Moffett, witness for the State, testified, in part: "I heard a conversation between Ralph Fisher and Mr. N. A. Miller and others. Q. What did he, Fisher, say? Answer: Mr. Fisher made a remark that caused Mr. Miller to turn to him and say he ought to be careful how he talked. . . . Mr. Fisher said, 'You know that we sacrificed the Republican Party to hold the Brevard Banking Company up and when we did, you made an agreement with us that it was not to be used against us in the campaign and that was the first thing you used when you went out on the campaign.' That was all he said in reference to that. No note was mentioned at that time. This was after the bank closed. (Cross-examination.) No mention was made of the $100,000 note. We were talking about politics. We were talking of the political campaign, and Mr. Miller belonged to the opposite party from Mr. Fisher. They seemed to be serious. They were rather hot. I have known them to get mad over politics."

(E) R. H. Ramsey, a witness for the State, testified, in part: "I am a practicing attorney at Brevard, and am now mayor of Brevard. I had a conversation not directly with Fisher, but I was present and heard it. The first of it was here in the back of the courthouse. Mr. Breece was present and I think Mr. Kimsey was present also. This was sometime after the first indictment here was returned into court, the one they are being tried on now. Q. State what he said in reference to the note in the bank? Answer: Mr. Fisher accused Mr. Breece of being responsible for his indictment and Mr. Breece said 'You know I would not have indicted my own client.' Mr. Fisher said 'Well, you shoved him in to get me in.' And Mr. Breese said 'You know I would not have

my own client, Silversteen, indicted,' and Fisher said, 'Well you probably saw he was going to fall in and you pushed me in.' And the consequence of the conversation was they were asking his advice as county attorney, and he said 'Oh, hell, I am as guilty as they are, and if they are convicted I want to be convicted also.' I had another conversation with him the same morning in the judge's room. Mr. Kimsey, Mr. Breese and another gentleman I did not know. Mr. Kimsey or one of them said, 'We do not know what the one hundred thousand dollars indictment was brought on.' And he then proceeded to tell us the basis of the indictment. He said last fall, when he was passing, they called him into the bank, or asked him to come down, and he went down, and Mr. Shipman was present, and I can't be positive, but I think he said Mr. McNeely and Mr. Pickelsimer were present also. And they sat down and Mr. Shipman said 'You gentlemen have a note coming due,' and I think he said on 15 December, 'and we cannot pay that without taking the breeches off some of the best people in town'—I think Mr. Fisher said they called him out of bed, and he went down there. He said the note was for $75,000. When Mr. Shipman made that statement Mr. Fisher said that Mr. Shipman recommended that they borrow enough to meet that note, and Mr. Fisher said that he was not there to pass on the business end of it but on the political end, and that if they borrowed this, that they would hold it for threats politically, and that he would agree if they would sign a letter agreeing not to use that against them in the campaign, and that Mr. Silversteen was in the east; and that Shipman and Silversteen signed the letter, but that Mr. Breese did not sign and used it in the campaign. Q. What, if anything, did he say about what became of the one hundred thousand dollar note when issued? Answer: He said the note was issued and turned over to Silversteen and that he kept it about two months, and then towards the latter part of November they saw they had to do something and they went to the bank, and that the bank officials, without any authority, issued certificates of deposit to Mr. Couch for the hundred thousand dollar note and then deposited it as collateral in New York. . . . I have heard Mr. Fisher make the statement that he would not do anything at any time to aid that bank. I believe I have heard him make the statement that the indictment was the result of prejudice to try to down him here in the county as county attorney. I also heard him state that he would not do anything to aid Mr. Shipman or Mr. Silversteen, or the bank, but I do not know whether the statements were made in that conversation."

The court instructed the jury not to consider the above evidence against any one but the defendant Fisher.

(F) Liability of Fisher to the bank $2,320 as maker, $40.00 as endorser, total $2,360.

STATE *v.* SHIPMAN.

There are other facts and circumstances in the evidence for the State against Fisher. The three above named defendants, Shipman, Silversteen and Fisher, were convicted on the conspiracy charge. We think the evidence ample to go to the jury.

We now consider the exceptions and assignments of error to the charge, as heretofore set out, viz.: "And wilfully and corruptly mean in bad faith and without regard of the rights of others and in the interest of such parties for whom the funds are held." Also "Before you can find the defendants or either of them guilty, you should find from the evidence, beyond a reasonable doubt, that they acted in bad faith. There is no denial of the fact that the tax anticipation notes were issued. The State contends that the issuance of these tax anticipation notes were done in bad faith and in consequence of an unlawful conspiracy and that you should so find beyond a reasonable doubt that the funds derived therefrom were misapplied. In other words, that they were put in the bank, although to the credit of the county, that the county did not need the funds and that the borrowing and applying of the funds was in bad faith, and that you should return a verdict of guilty as to each defendant upon that count in the bill of indictment. . . . The State contends the funds borrowed on the tax anticipation notes were not deposited until two months thereafter, that if the tax anticipation note had been a necessity that the necessity for it had disappeared prior to the time the funds were available, and that the act of the commissioners in issuing the notes was done in bad faith, *fraudulently, wilfully and corruptly* in the effort and desire and consequence of an unlawful conspiracy to aid the Brevard Banking Company. . . . In the present case the State contends that the defendants, and each of them, and that you should so find, beyond a reasonable doubt, from the evidence, entered into an unlawful conspiracy, to wit, to issue tax anticipation notes in the sum of $100,000 against the interest and in bad faith—in bad faith and against the interest of the taxpayers of Transylvania County; and that you should further find, beyond a reasonable doubt, or to a moral certainty—you will remember what a reasonable doubt is as defined to you yesterday by the court—that the defendants, and each of them, committed the overt act which they had unlawfully conspired to do, and that you should so find, beyond a reasonable doubt; and should further find in like manner that the overt act was committed and the defendants (proceeds) applied in bad faith, not in the interest of the taxpayers of Transylvania County, *but corruptly and wilfully to the credit of the county in the Brevard Banking Company for the purpose of aiding said bank and not for the purpose of aiding the county or the taxpayers of the county."* There was no exception to the latter part in

italics, nor was there any exception to the following portion of the charge: "I instruct you that the intent alleged and contended by the State to commit the acts and offenses alleged by the State is a necessary ingredient, and the burden is on the State to satisfy you beyond a reasonable doubt of that intent. The State contends from all the evidence you should be satisfied beyond a reasonable doubt of the felonious intent. The defendants contend that you should not be satisfied beyond a reasonable doubt that such acts as they did were done not in consequence of any conspiracy or agreement; and they further contend that even though you should find that it was not necessary to borrow the funds; that they did borrow, that you should not find beyond a reasonable doubt it was done in bad faith or that there was any intent to do wrong." If the defendants wanted the court below to elaborate, they could have requested this by prayers for instructions.

Taking the charge as a whole it is correct. The statute was read to the jury which held that the misapplication must be done *wilfully and corruptly*. The court, under the bill of indictment, correctly charged "The defendants are not chargeable . . . with an error of judgment or a mistake." *S. v. Powers,* 75 N. C., 281; *S. v. Norris,* 111 N. C., 652; *Staton v. Wimberly,* 122 N. C., 107; *S. v. Anderson,* 196 N. C., 771. See *S. v. Lattimore,* 201 N. C., 32.

In Black's Law Dictionary (2d ed.), p. 1228, citing authorities, *wilful* is defined: "Proceeding from a conscious motion of the will; intending the result which actually comes to pass; designed; intentional; malicious. . . . In common parlance, 'wilful' is used in the sense of 'intentional,' as distinguished from 'accidental' or 'involuntary.' But language of a statute affixing a punishment to acts done wilfully may be restricted to such acts done with an unlawful intent." *S. v. Falkner,* 182 N. C., 793; *West v. West,* 199 N. C., 12.

"Corruption," Black, *supra,* at p. 277, citing authorities: "Illegality; a vicious and fraudulent intention to evade the prohibitions of the law. The act of an official or fiduciary person who unlawfully and wrongfully uses his station or character to procure some benefit for himself or for another person, contrary to duty and the rights of others." The word "corruptly" when used in a statute generally imports a wrongful design to acquire some pecuniary or other advantage. *Grebe v. State,* 112 Neb., 715, 201 N. W. Rep., at p. 144.

"Bad Faith," Black, *supra,* at p. 112, citing authorities: "The opposite of 'good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some

interested or sinister motive." Bad faith and fraud are synonymous. *Hilgenburg v. Northrup,* 33 N. E., 786; 134 Ind., 92.

The defendants must have a felonious intent, the court below so charged. *S. v. Lancaster, ante,* 204.

All of the following defendants were found guilty of (1) misapplication (2) conspiracy. J. H. Pickelsimer, chairman of the board of county commissioners, C. R. McNeely, a county commissioner and also county accountant, A. M. White, S. R. Owen and W. L. Talley, county commissioners.

J. H. Pickelsimer—misapplication and conspiracy: Evidence (A) He was chairman of the board of county commissioners. From 1 August, to 15 December, 1930, when the bank closed the county of Transylvania had at all times over half a million dollars in the Brevard Banking Company, except 28 November, 1930, it was the lowest $472,-887.86. On 29 November, it shows with the bond sale and interest $101,625, added and other amounts making $579,187.86.

(B) When the tax anticipation notes resolution for the sale was passed, Shipman, president of the bank, was in the commissioners' room with all the commissioners, and Pickelsimer, McNeely, Shipman and Silversteen were together in the county accountant's office a few days before the sale resolution of 1 September.

(C) He and the board had the letter of the two bankers, Shipman and Silversteen, which was afterwards published in the newspaper "To carry on schools and road work while taxes are being collected," and at the time in the bank there was over a half million dollars of the county's money, and large sums already allocated to schools and roads.

(D) After the tax anticipation notes sale was ordered for the $100,000 and purchased by the Brevard Banking Company, the bankers kept the notes and did not sell them until about two and a half months afterwards, when there were heavy withdrawals from the bank and a falling off of deposits, then on 29 November, 1930, credited the sale to the county.

(E) Ira Galloway, a witness for the State, testified, in part: "Q. Prior to the time that letter was written, had you seen the defendants Silversteen and Shipman in conference with any of the commissioners? Answer: Yes. Q. On the first time that you saw them there, where were they and who was present? Answer: Mr. Shipman and Mr. Silversteen were in Mr. McNeely's office with Mr. McNeely and Mr. Pickelsimer. I did not hear their conversation. Q. How long was that before this letter was written and published? Answer: I do not know just how long. Just a few days. I could not say just how many days it was. The best of my recollection is that Shipman was up there in the commissioners' room on 3 September, when the resolution was passed. There

were present at the meeting Mr. Pickelsimer, Mr. McNeely, Mr. Owen, and to the best of my recollection, Mr. Fisher was there at that meeting. Q. (By the solicitor) : What was the discussion that day ? Answer : They talked about this note issue, this hundred thousand dollar note and also passed a resolution in regard to it."

Liability of Pickelsimer to the Brevard Banking Company $12,000 as maker, endorser $6,575, overdraft $6.12, total $18,581.12. There are other facts and circumstances in the evidence for the State against Pickelsimer. We think the evidence was sufficient to be submitted to the jury.

C. R. McNeely—misapplication and conspiracy: Evidence (A) He was a county commissioner and also county accountant. Before the tax anticipation notes for $100,000 were issued, he knew of the amount in the Brevard Banking Company, belonging to the county as being over a half million dollars. He was in conference with Shipman, president of the bank and others. On 1 September, 1930, he addressed a letter to the board, signed by himself, and among other things, said : "It is necessary to borrow $100,000 for the purpose of paying appropriations made for the current fiscal year in anticipation of the collection of the taxes and other revenues of the current fiscal year. I, therefore, submit herein the statement and certificate required of me by section 4 of 'The County Finance Act,' " etc. All the members were present when the resolution was passed. "Whereupon the board, upon the motion of W. L. Talley and seconded by Mr. A. M. White, then adopted same without change or amendment by the following roll call vote," etc.

(B) All the commissioners voted "Aye," and all the commissioners signed the resolution. He saw the letter of the bankers, heretofore set forth, to the board, and which was published in the newspaper signed 3 September, 1930.

(C) He was present on 17 September, 1930, when the tax anticipation notes of $100,000 were sold to the Brevard Banking Company. He and all the commissioners signed the sale resolution.

(D) He knew, of all men in the transaction, the financial condition of the county. That was his special duty—county accountant. The bankers kept the $100,000 of bonds in denominations of $10,000 each for nearly two and a half months, and after heavy withdrawals from the bank and a falling off in deposits, sold same and deposited the proceeds of the notes and interest, $101,625, and they were allocated 29 November, 1930. At the time large sums of money had already been allocated for schools and roads and in the bank for those purposes.

(E) M. B. Bagwell, a witness for the State, testified, in part : That McNeely asked him "if he was on the grand jury and that McNeely said

he did not see why they found a bill against him and I replied they could not help it according to the law and evidence. Q. What else? Answer: I told him that I did not see how they could borrow a hundred thousand dollars with the money they had in the bank." The court instructed the jury that this evidence was admitted only as to defendant McNeely. The witness said McNeely told him that they had to do it to save the bank.

(F) H. N. Blake, a witness for the State, testified, in part: "I am acquainted with T. R. McNeely, one of the defendants. I had a conversation with him with reference to the note in question. I asked McNeely why he borrowed the money when he had it here in the bank to pay the note and he said well, he came home from Ves Ashworth's funeral one day and three of the bank officials, Mr. Shipman, Mr. Silversteen and Mr. Allison were at his room and that they had already got Mr. Pickelsimer there and that they wanted to borrow this money by this note instead of drawing it out of the bank because the bank was in a precarious position. Mr. McNeely said he objected to agreeing to sign that note and he thought it over and he thought if it was going to ruin Transylvania County for the bank to close, he thought it would be better to borrow the money and pay for it than to try to take it out of the bank." The court instructed the jury not to consider this evidence against any of the defendants except McNeely. The witness continued: "Q. What did he say, if anything, with reference to Mr. Shipman and Mr. Silversteen? Answer: He said that Mr. Shipman and Mr. Silversteen said that they would see that there was no blame attached to him in borrowing this money. That is as far as the election was concerned; that they borrowed the money before the election."

W. H. Grogan, a State's witness, testified to a conversation with McNeely, substantially as the above.

(G) John C. Tinsley, a witness for the State, had a conversation with C. R. McNeely, testified, in part: "I don't know as to that particular $100,000. We had a conversation right after the bank closed and found out they had $581,000 there to their credit and I asked them why they were borrowing money with all that credit in the bank and he said something similar to 'if they had called on them for the money they could not have paid it.' That is about all. I asked him why they were borrowing money with all that deposited in the bank. It was just curiosity of me. He said if they had called on them for the money they could not have paid it."

(H) The liability of McNeely to the Brevard Banking Company, as maker $5,115, as endorser $5,006.24, total $10,121.24. There are other

facts and circumstances in the evidence for the State against McNeely. We think the evidence was sufficient to be submitted to the jury.

A. M. White, S. R. Owen and W. L. Talley—charge misapplication and conspiracy against them as county commissioners: We see no sufficient evidence against A. M. White, S. R. Owen and W. L. Talley to have been submitted to the jury. We are now dealing with a criminal charge. It seems that certain motions were made by W. L. Talley and seconded by A. M. White, in regard to the issuance and sale of the tax anticipation notes. They could have relied on the statements of C. R. McNeely, county accountant. It was his duty to inform the board of county commissioners in reference to financial matters. The certificate from him to the board was headed: "Certificate of county accountant chief financial officer of Transylvania County, North Carolina. To the board of county commissioners, certifying financial data as a basis for issuance of revenue, anticipation notes." He signed the certificate and resolution "C. R. McNeely, county accountant, chief financial officer of Transylvania County, N. C."

It seems as if the settlement with the county attorney on 29 November, 1930, the motion was made by W. L. Talley and seconded by S. R. Owen. A. M. White had some 23 shares of stock in the bank: 3 shares dated 13 March, 1914; 5 shares dated 13 March, 1914; 3 shares dated 6 May, 1916; 2 shares dated 9 September, 1916; 10 shares dated 10 November, 1917.

The liability of Owens to the Brevard Banking Company, as maker was $600, endorser $1,923.10, total $2,523.10.

The liability of Talley as maker was $409, endorser $40.00, total $449.

The liability of White as maker was $3,133.33, as endorser $1,833.33, total $4,966.66.

There are other suspicious circumstances against these defendants, but we do not think the evidence sufficient to have been submitted to the jury. The fact that the evidence against these three defendants was not strong, no doubt was the reason the court below imposed the fine of $1,000 against each of them on the conspiracy charge and judgment was suspended on payment of the costs on the misapplication charge.

After a painstaking study of the record, we think defendants' many and numerous contentions and assignments of error are without merit. The court's remark on the redirect examination of Galloway, which defendants contended was an expression of opinion, under the circumstances, we do not think prejudicial. *S. v. Robertson,* 86 N. C., 629. The letters dated 16th and 17th of October, published in the *Brevard News,* from Pickelsimer to Shipman, and the purported reply of Ship-

man thereto, if introduced improperly against Shipman, is not so material as to be prejudicial, but we think they were properly proved. Many of the exceptions and assignments of error to the charge of the court below are to contentions. They cannot be sustained. The matter at the time should have been called to the attention of the court. *S. v. Sinodis,* 189 N. C., at p. 571. We do not think the court impinged on C. S., 564. *Davis v. Long,* 189 N. C., 129.

We cannot say that the judge's charge was abstract propositions of law without reference to the facts. As to what constituted conspiracy in the beginning of the charge, and fully set out in this opinion, was later set forth and made applicable to the facts. The court below narrowed the evidence, in its introduction as against the particular defendants, although some of it was competent against all after evidence of the conspiracy was shown aliunde. The evidence was restricted on the trial to the particular individual or individuals, the charge giving the different aspects of the law of conspiracy was not prejudicial, the matter was easily reconcilable and not in conflict. *May v. Grove,* 195 N. C., at p. 237. A foundation was laid, but the evidence restricted, this was favorable to defendants. "Here a foundation must first be laid, by proof, sufficient in the opinion of the judge, to establish, prima facie, the fact of conspiracy between the parties, or proper to be laid before the jury, as tending to establish such fact." 1 Greenleaf on Evidence, sec. 111, at p. 126.

It may be noted that none of the State's evidence was denied by the defendants. A serious charge of misapplication and conspiracy was made against them by the State and they made no denial except the plea of not guilty, and that the evidence was not sufficient to be submitted to the jury. The court below fully protected them under the statute—that not going on the stand should not create any presumption against them is not to be considered to their prejudice.

The gist of the matter can be detected in what Ramsey in his testimony said he heard Ralph Fisher, attorney for the board, say: "They called him into the bank, or asked him to come down, and he went down, and Mr. Shipman was present, and I can't be positive, but I think he said Mr. McNeely and Mr. Pickelsimer were present also. And they sat down and Mr. Shipman said 'You gentlemen have a note coming due,' I think he said on 15 December, 'and we cannot pay that without taking the breeches off some of the best people in town.'" In this remark, the taxpayers of the county were forgotten, and proved to be the victims.

At the time the bank closed, on 15 December, 1930, the liability of the main actors in the indictment, was as follows:

18—202

Shipman, president of the bank (part of overdraft disputed)..$50,219.75
Silversteen, vice-president of the bank. ...... .. ................... ........  23,990.00
Pickelsimer, chairman of board of county commissioners ......... 18,581.12
C. R. McNeely, county accountant and member board
        county commissioners ........................................... .. ......... 10,121.24
Ralph Fisher, county attorney.....................................................  2,360.00
                                                                                                        —————
        Total ......:............................................. .................. ..........$105,272.11

Shipman had an overdraft (which was disputed) of $21,703.81, and Pickelsimer had an overdraft of $6.12. Silversteen had on deposit $212.79, McNeely $358.06 and Fisher $313.05.

On deposit to the credit of Transylvania County was the sum of $561,145.86.

The court below charged the jury: "The court instructs you in analyzing the testimony and making up your minds about this case, you will remove from your minds every prejudice and . bias, and relying only upon your oaths that you will sit together, hear the evidence, and render your verdict accordingly."

The jury are the triers of the facts and have· found the defendants Shipman, Silversteen and Fisher guilty of conspiracy; and Pickelsimer and McNeely guilty . of conspiracy and misapplication. In law, as to them, we see

No· error.

As to White, Owen, and Talley, the motion to dismiss the action or for judgment of nonsuit should have been granted by the court below as to them. The judgment of the court below, as to them, is

Reversed.

CONNOR, J., dissenting. At the trial of· this action in the Superior Court of Transylvania County, the defendants, T. H. Shipman, J. S. Silversteen, J. H. Pickelsimer, C. R. McNeely, Ralph Fisher, A. M. White, S. R. Owen and W. L. Talley, were each convicted of a criminal conspiracy, as charged in the indictment; the defendants other than T. H. Shipman and J. S. Silversteen, were also convicted of the criminal misapplication of funds belonging to Transylvania County. The jurors in their verdict recommended that mercy be extended to each of the defendants in the judgment of the court.

The judgment on the verdict that the defendants are guilty of a criminal conspiracy as charged in the indictment was (1) that the defendants, T. H. Shipman, J. H. Pickelsimer, C. R. McNeely and Ralph Fisher, each pay a fine of $5,000, and be confined in the State's prison

for a term of not less than two or more than five years; (2) that the
defendant, J. S. Silversteen pay a fine of $5,000; and (3) that the de-
fendants, A. M. White, S. R. Owen and W. L. Talley, each pay a fine
of $1,000..

It was ordered by the court that judgment on the verdict that the
defendants other than T. H. Shipman and J. S. Silversteen, are guilty
of a criminal misapplication of funds belonging to Transylvania County,
as charged in the indictment, be continued, and that the defendants pay
the costs of the action, pro rata, as directed in the judgment.

From the judgment, the defendants appealed to this Court, assigning
errors at the trial, for which they contend that the judgment should be
reversed, or at least that they be granted a new trial. On this appeal,
the assignments of error based on the exceptions of the defendants, A. M.
White, S. R. Owen and W. L. Talley, to the refusal of the trial court
to allow their motions for judgment as of nonsuit (C. S., 4643), are
sustained. Under the provisions of the statute, a verdict of not guilty
as to these defendants will be entered in the Superior Court of Transyl-
vania County. This Court is of the opinion that the evidence at the
trial was not sufficient to support a verdict of guilty as to the defendants,
A. M. White, S. R. Owen and W. L. Talley, and therefore reverses the
judgment as to these defendants. The judgment as to the other defend-
ants is affirmed. I concur with *Brogden, J.,* that the evidence is not
sufficient to sustain the verdict of guilty as to any of the defendants
and that for this reason the judgment of the Superior Court should be
reversed not only as to the defendants, A. M. White, S. R. Owen and
W. L. Talley, but also as to the other defendants.

In my opinion, there was no evidence at the trial of this action in
the Superior Court tending to show that the defendants, or any two
or more of them entered into an agreement to do an unlawful act, or to
do a lawful act for the purpose of accomplishing an unlawful end, or
that any of the defendants misapplied any funds belonging to Transyl-
vania County, as charged in the indictment.

BROGDEN, J., dissenting. The two paramount questions arising upon
the evidence may be stated as follows:

1. Did the defendants Silversteen, Shipman and Fisher, participate
in procuring the issuance of tax anticipation notes, aggregating $100,000?

2. Did they participate in procuring the issuance of said notes for
the purpose of causing the proceeds thereof to be deposited in an in-
solvent bank of which Shipman and Silversteen were stockholders,
directors and officers, thus defrauding Transylvania County?

The scene opens at a funeral and ends for some of the defendants at the penitentiary. On 26 August, 1930, Ves Ashworth was buried, and on the way from the funeral Shipman and Silversteen requested a witness for the State, named Allison, to go with them to the courthouse to see the defendant, McNeely, the county accountant and financial officer of said county. The words of the witness tell the story: "Shipman told McNeely that Transylvania County had a note that would be due in a short time and that it would work a hardship on the people of Transylvania County to pay this note in that short time, and asked him if he could not give an extension of time. That is all I remember. McNeely said he could not do anything himself but to take it up with the other commissioners. . . . There was nothing said about borrowing money." Six days thereafter, to wit, 1 September, 1930, McNeely, the county accountant, filed with the board of commissioners a certificate in accordance with section 4 of the County Finance Act. This certificate shows that on 28 July, 1930, the board of commissioners had appropriated under three divisions the sum of $124,821.32 for schools and $15,148.88 for roads for the current fiscal year expiring 30 June, 1931. The certificate further declared: "It is necessary to borrow $100,000 for the purpose of paying appropriations made for the current fiscal year in anticipation of the collection of taxes," etc.

There is no evidence that any of the other defendants knew of, approved, or procured the filing of this certificate.

On the same day, to wit, 1 September, 1930, the board of county commissioners duly adopted a resolution authorizing the borrowing of $100,000 in anticipation of the collection of taxes, said loan to be evidenced by ten promissory negotiable notes of the county in the sum of $10,000 each. It was further ordered that advertisement for bids be published in the *Brevard News,* the *Asheville Times* and the *Daily Bond Buyer,* published in New York City, notifying prospective purchasers that bids would be received by the board "until ten o'clock a.m. on 13 September, 1930."

There was evidence that Shipman and Fisher were present when the resolution was adopted, but there is no evidence that they advised, counseled or even approved the resolution at that time. Silversteen was not present, and the trial judge expressly excluded as to him all evidence showing who was present at the meeting.

Immediately upon the passage of the resolution and the advertisement for bids, a political war began to flame and roar. The election was coming on in November. The editor of the local newspaper said: "The Democratic political leaders were making political capital of it over the county. . . . The battle was hot and fast and furious."

Thereupon, three days after the resolution was adopted, to wit, on 3 September, 1930, the defendants, Shipman and Silversteen, wrote the letter appearing on page 65 of the record and set out in full in the opinion of the Court. The letter was addressed to the board of commissioners, and while the newspaper editor put a so-called "lead" at the top of the letter as published, this "lead" was no part thereof.

September 13, 1930, was the day set for receiving and opening the bids for the tax anticipation notes. The commissioners met, but no bids were there. An order was passed declaring: "It is desired to dispose of the said notes to meet the needs of appropriations made in anticipation of the collection of taxes," etc. And it was ordered that the meeting adjourn until Wednesday, 17 September, 1930, at ten o'clock a.m., "at which time the board will entertain bids for $100,000 revenue anticipation notes."

When the board met on 17 September, the Brevard Banking Company, through its president, Thomas H. Shipman, by a written proposal, dated 17 September, offered to purchase the notes at par, provided the "board will furnish the transcript of proceedings sufficient to evidence the legality of the notes to the full satisfaction of Clay, Dillon & Vanderwater, bond attorneys of New York City." The board, finding that "the bid of the Brevard Banking Company to be the highest and best bid," awarded the notes to said bank.

At this point, there is a break in the evidence. It does not appear what became of the notes. They were not in the bank. Whether the delay was due to inability to find a purchaser for them or that the bond attorneys in New York had not approved the issue is not disclosed. The liquidating agent, however, testified: "The bank did not get the money for those notes and the county did not get credit for them until 24 November." Nevertheless, on said date the county received credit for every penny of the money plus interest, and the proceeds were distributed to the various county funds.

The bank was closed on 15 December, 1930.

The foregoing is the chronological development of the transactions from inception to the closing of the bank.

A survey of the movement of events, as disclosed by the evidence, totally fails to connect the defendants, Silversteen, Shipman or Fisher with the issuance of the notes unless the letter of 3 September, 1930, is sufficient to identify them as conspirators if any conspiracy existed. The letter and the bare fact that Shipman and Silversteen were seen at the courthouse on one occasion on 26 August, and that Shipman and Fisher were present when the resolution was adopted, is the sum total of the evidence against them. All other evidence as to Silversteen was

expressly excluded by the court except testimony showing how much stock he owned in the bank, the amount of his deposits and the aggregate of his indebtedness. The fact that he was a depositor and stockholder in the bank did not have even an imaginary bearing upon the conspiracy, and the evidence in behalf of the State was directly, explicitly and unequivocally to the effect that all his notes were "good and perfectly solvent." Therefore, the only possible evidence competent against him and his codefendant Shipman was the letter of 3 September, 1930. Consequently, it is desirable to analyze that document in the light of the circumstances, and, of course, with due regard for the reasonable inferences and implications arising therefrom. The undisputed facts surrounding the letter may be summarized as follows: (1) The letter was written to the board of commissioners and not to a newspaper. How and from whom the newspaper editor received it is not disclosed. Nor does it appear that it was published with the knowledge, consent or approval of either Fisher, Shipman or Silversteen. (2) It was written three days after the notes were actually authorized by resolution duly adopted, and after the board of commissioners had adjourned. Manifestly, if a conspiracy was on foot in the adoption of the resolution, such conspiracy was a completed fact before the letter was written. (3) The authorization of the notes by the board had created a political war, and the transaction had subjected the members thereof to bitter criticism and attack. (4) At the time it was written there was no suggestion that the bank should purchase the notes. Neither did it appear that the bank desired or contemplated the purchase thereof. How could Shipman or Silversteen know or even surmise, notwithstanding wide publication for bids, that no bid would be received ten days thereafter?

In short, the letter, viewed in its setting, was no more than an expression of approval of the business judgment and discretion of a politically badgered governing authority.

But it is insisted that the letter was false to the knowledge of the writers. The falsity is based upon the fact that on 1 September, 1930, the county had in bank to the credit of various funds the sum of $627,296.13. Consequently, it is argued that there was no necessity for borrowing more money, particularly for schools and roads because the school fund had to its credit the sum of $72,230.71, and the road fund $13,410.23. Included in the total balance of $627,296.13 was $278,000 proceeds of a bond issue under chapter 436, Public-Local Laws of 1929, which specifically provided that the money should be deposited in the bank "and held as a separate fund to be used only for the purposes authorized by this act." Hence this fund must not be counted in deter-

mining the amount of available money for general county purposes. In addition, there were two tax anticipation notes of $75,000 each, payable on 15 September, and 15 December. Consequently, this sum of $150,000 should be deducted from the total balance in determining the amount available for general county purposes for the fiscal year. Furthermore, interest charges on various bond issues shown in the budget for the fiscal year was $87,000. Certain sinking funds were also included in the total, which, of course, should be deducted in arriving at available revenues. The result is, from a perusal of the evidence, that when the notes and bond interest items were paid that the county would have had slightly more than $100,000 available for all purposes for the entire fiscal year except such as might be realized from the collection of taxes. The fiscal year began on 1 July, and, therefore, on 1 September, only two months of the fiscal year had expired. The county accountant testified that in paying the $150,000 of notes the said sum would be drawn from the following funds in the bank: (a) general county, $2,000; (b) health and poor, $5,000; (c) road fund, $23,000; (d) debt service, $45,000; (e) school fund, $75,000. As the school fund on 1 September, had on deposit only $72,230.71, it is obvious that when the notes were paid in September and December that the entire school fund would be wiped out, leaving no funds available to operate the schools from 15 December to the end of the fiscal year, unless, of course, taxes could be collected or money borrowed.

Therefore, when Shipman and Silversteen stated in the letter to the county commissioners on 3 September, 1930, that it was "good business . . . to borrow against uncollected taxes in order to keep the schools and roads going," said statement is established as true by the evidence offered by the State, and yet Silversteen and Shipman and their descendants are marked with the burning brand of felony merely because they wrote a letter which contained no false statement or representation.

But for the sake of the argument, let it be assumed that Silversteen and Shipman and all the other defendants participated in procuring the issuance of the tax anticipation notes. The issuance of the notes worked no hurt to the county if the proceeds were deposited in the bank to the credit of the county, unless, of course, the bank was insolvent. Was the bank insolvent? The sole and only evidence of insolvency was the testimony of the liquidating agent. He testified that in his opinion the bank was insolvent, but continuing his testimony, he said: "I stated that in my opinion the Brevard Banking Company was insolvent on 17 September. By the use of that term I mean if the bank had closed that day, it would not have been able to pay off all of its creditors." In other words, every man is insolvent, who, upon leaving

his office at night, if all of his creditors met him at the door, could not pay them in full at that instant; or a bank would be insolvent if at the close of business on any particular day, all of its creditors should appear at the cashier's window, and it was unable to hand out in cash the full amount due every creditor. This conception of the solvency of a bank or of an individual is so weird that I do not pause to debate it. Obviously, the opinion evidence of insolvency was based upon a false and erroneous assumption, and such opinion is therefore no evidence at all, and upon objection, it was the duty of the judge to strike it from the record.

The evidence, in its entirety, produces certain clear cut, and indisputable conclusions:

(1) The board of county commissioners of Transylvania County, in strict accordance with law, and in the exercise of a judgment and discretion delegated by statute, authorized the issuance of ten negotiable, tax anticipation notes, aggregating one hundred thousand dollars.

Consequently the issuance of said notes was a lawful act.

(2) The sale of the notes to the Brevard Banking Company, was duly made to the only bidder, complying with the terms thereof and with the statute.

(3) The proceeds of the sale were duly received and deposited to the credit of various funds of the county, in a depository duly and regularly appointed and designated in accordance with law. Moreover, there is no evidence that said depository had not complied with chapter 146, section .19, of the Public Laws of 1927, and in pursuance thereof furnished bonds "in an amount sufficient to protect such deposits." Indeed, it affirmatively appears that at the time of the deposit the county held surety bonds and collateral in excess of three hundred and seventy thousand dollars to protect public funds.

(4) At the time the notes were issued the appropriation for schools for the fiscal year was $124,821.32, and there was available for general school purposes on hand the sum of $72,230.71. Tax anticipation notes aggregating $150,000 were falling due on 15 September and 15 December. In paying these notes it would have been necessary to withdraw seventy-five thousand dollars from the general school fund, theretofore allocated, and hence on 15 December the general school fund, unless supplemented by tax collections or borrowed money, would have been overdrawn.

(5) There is no evidence that any defendant received an atom or electron of benefit from the transaction, or that the county has lost or will lose a penny because of the issuance of notes.

(6) There is no competent evidence of the insolvency of the bank on the date of the passage of the note resolution, or if insolvent that any defendant knew of it.

The State attempts to show insolvency by certain declarations of Shipman to the effect that if the bank should be compelled to pay out seventy-five thousand dollars, it would work a hardship on the people of the county, because the bank would necessarily raise the fund by collecting from its debtors. Shipman described the situation in rather homely English when he said that enforced collections by the bank would "take the breeches off of some of the best people in town." This however, should not be imputed to him for conspiracy, for under economic conditions then and now prevailing, some of the best people in every community in the country have not only lost their breeches but their underclothing also, under the compulsion of paying debts to banks and other creditors.

In general terms a conspiracy is an agreement to do an unlawful act, or to do a lawful act in an unlawful way.

In the case at bar, the evidence conclusively established the fact that the issuance of the notes was a lawful act. Now, what unlawful means were employed?

The State contends that the unlawful purpose consisted in depositing the money in an insolvent bank. But the State failed to offer any competent evidence of insolvency, or that the county had suffered the loss of a penny. Where is the crime? Where is the proof of any crime?

The evidence for the State says that a bank in Transylvania County failed on 15 December, 1930, and that at the time the county had $561,145.80 on deposit therein. It says further, that the county commissioners on 17 September, had lawfully sold one hundred thousand dollars of tax anticipation notes, and that in accordance with law the proceeds thereof had been duly deposited in a lawful depository, which had given the bonds or security as required by statute for the protection of public funds. For this several of the defendants go to the penitentiary.

After a thorough study and analysis of the evidence, I cannot reach the conclusion held by the majority of my brethren. I can see no crime and no competent proof of any crime described in the bill of indictment.