CLARKSON, J., dissenting; CLARK, C. J., concurring in dissenting opinion. *Page 302 
Criminal prosecution, tried upon an indictment charging the defendant and one H. H. Massey, president and cashier, respectively, of the Central Bank and Trust Company, a banking institution located in the city of Raleigh, N.C. with wilfully and feloniously receiving money, checks, drafts or other property as deposits in said Central Bank and Trust Company on 13 January, 1922, when they and each of them had knowledge of the fact that such banking institution was insolvent and unable to meet its depositary liabilities as they become due in the regular course of business, in violation of chapter 4, section 85, Public Laws 1921.
The jury acquired the defendant H. H. Massey and convicted the defendant J. H. Hightower. From a judgment sentencing the defendant Hightower to an indeterminate imprisonment in the State's Prison of not less than two and one-half years and not more than four years, as provided by C. S., 7738, the defendant appealed, assigning errors.
The pertinent provisions of the statute, under which the present indictment is laid, are as follows:
"Sec. 85. Insolvent banks, receiving deposits in. Any person, being an officer or employee of a bank, who receives, or, being an officer thereof, permits an employee to receive money, checks, drafts or other property as a deposit therein, when he has knowledge that such bank is insolvent, shall be guilty of a felony, and upon conviction thereof shall be fined not more than five thousand dollars or imprisoned in the State's Prison not more than five years, or both." Chapter 4, Public Laws 1921.
In the first section of said act, so far as now applicable, the term "insolvency" is defined to mean: (a) "when a bank cannot meet its depositary liabilities as they become due in the regular course of business"; and (b) "when the actual cash market value of its assets is insufficient to pay its liabilities to depositors and other creditors." The remaining definition of said term, as contained in the statute, is not material for present purposes. The evidence relates only to the ones just given.
In order to obtain a conviction under the provisions of this statute, it may be observed in limine, the State must prove beyond a reasonable doubt: (1) that the deposits described in the bill of indictment were actually received; (2) that the bank in question was insolvent at the *Page 303 
time the alleged deposits were received therein, and (3) that the defendant, officer or employee of the bank, received, or such officer thereof permitted an employee to receive, said deposits, with knowledge, at the time, of the insolvency of such bank. These are the essential elements of the offense condemned by the statute, and which is denominated a felony therein.
The principal evidence offered by the State, of which the defendant first complains, is that of Clarence Latham, State Bank Examiner, and W. S. Coursey, an expert accountant, or "auditor employed by the banking department to make an audit of the bank" (defendant's brief), to the effect that, in the opinion of said witnesses, the Central Bank and Trust Company was insolvent on 13 January, 1922, the day on which it is alleged the defendant, as president of said banking institution, received certain deposits therein, with knowledge at the time that such banking institution was then insolvent. These opinions were based upon an examination and investigation of the affairs of the bank, made by the two witnesses in the discharge of their official duties. The competency of this evidence is assailed upon two grounds:
First, It is challenged because, it is alleged, the witnesses were allowed to express their opinions upon one of the essential facts necessary to constitute the offense charged, and which the jury alone was impaneled to decide. "Whatever liberality may be allowed in calling for the opinions of experts or other witnesses, they must not usurp the province of the court and jury by drawing those conclusions of law or fact upon which the decision of the case depends," says Fuller J., in S. v. Stevens,16 S.D., p. 317, a case dealing with the insolvency of a bank. And, speaking to a similar question, in People v. Paisley, 288 Ill. 310, Duncan. J., says: "No witness can thus invade the province of the jury, expert or otherwise." See, also, S. v. Myers, 54 Kan. 206; Ellis v. State, 138 Wis. 513.
Second. It is questioned because, as a prerequisite to the expression of such opinions, the witnesses were not required to state the facts upon which they based their conclusions. In White v. Bailey, 10 Mich. 155,Campbell, J., says that no witness, expert or other, should be allowed to give in evidence an opinion on one of the essential facts to be shown, unless he first state the foundation or basis of his opinion. "This is necessary for two reasons: First, it is necessary, in order to enable other experts to determine whether the opinions expressed by the witness are correct, and to enable the parties to contradict them, if wrong. Second, it is necessary, in order that, if an opinion is given on a mistaken or perverted statement of facts, the truth may be elicited from others to destroy the foundation of the conclusions. And a third reason might be mentioned, which is, that the court and jury may know, from his *Page 304 
opportunities, what means the witness had of forming any opinion at all. These are rudimentary principles, which cannot safely be departed from."
We have cited some of the authorities, probably the strongest ones, which tend to support the defendant in his position on the two grounds stated above. But the decisions elsewhere are not all one way. They are in sharp conflict. The precise question now raised apparently is presented for the first time in this jurisdiction — certainly for the first time under the present statute. In the light of the instant record, we think the defendant's initial class of objections to the admission of the opinion evidence of the witnesses, Latham and Coursey, must be overruled on both grounds. These witnesses, the one a State bank examiner and the other an auditor employed by the State Banking Department, it is conceded, possess special skill for interpreting or drawing inferences from the observed data of their own, or from observed data furnished by others, and their conclusions or opinions purport to be based upon an examination or investigation of the subject-matter about which they undertake to speak. "To warrant its introduction" (expert opinion evidence), says Earl, J., inFerguson v. Hubbell, 97 N.Y., p. 513, "the subject of the inquiry must be one relating to some trade, profession, science or art in which persons instructed therein, by study or experience, may be supposed to have more skill and knowledge than jurors of average intelligence may be presumed generally to have." And to like effect is the language of Beck, C. J., inHamilton v. R. R. Co., 36 Iowa, p. 36: "Every employment requires a degree of skill, and there is none in which a degree of proficiency may not be obtained by practice. This fact is no ground for the admission in evidence of the opinions of men engaged in every pursuit in regard to matters pertaining thereto. The pursuit in which the witness claims to be an expert must be one of science, skill, trade, or the like; these things pertain to the pursuit, and opinions of those proficient therein may be heard. But one skillful in pursuits not of this character may not give an opinion. The pursuit itself must be considered in determining who may be examined as experts."
The business of examining banks undoubtedly falls within the classification of trades or pursuits, requiring special skill or knowledge, and hence one versed in its intricacies, we apprehend, should be permitted to speak as an expert. It is not questioned, on the instant record, but that the two witnesses offered by the State are competent to speak as experts in their field or in their line of work.
Mere opinion evidence was wholly rejected by the early English courts as being insufficient to support an absolute judgment or to hold a witness for perjury. Hence it was not received as evidence at all. *Page 305 
"It is no satisfaction for a witness to say that he `thinketh' or `persuadeth himself,'" was the reason assigned for its exclusion by Coke. And in S. v. Allen, 8 N.C. p. 9, Henderson, J., said: "The law requires that he who deposes to a fact should have the means of knowing it. Grounds of conjecture and opinions are not sufficient." But the law in this respect has been the subject of considerable growth and development, both in England and in this country. The history of this development, beginning with its original exclusion and leading up to the admission of such evidence, with illustrations from the decisions of the courts, is given by Wigmore in his valuable work on the subject of Evidence. In this connection he refers to the practice of admitting opinion evidence by experts based upon observation or investigation, and concludes that such evidence by experts of conceded skill and experience may be received without in the first instance necessarily requiring the facts observed or discovered to be stated to the court and jury, such disclosures being more properly a matter for cross-examination. We quote from section 1922:
"It has already been seen, in reviewing the history of the doctrine, that in the beginning the disparagement of opinion rested on grounds totally different from those now received. It was objected to because, as a mere guess, the belief of one having no good grounds, it lacked the testimonial qualification of observation; hence, a mere opinion, as soon as it appeared to be such, must be rejected. In a few jurisdictions the modern doctrine has been confused with the earlier one, and it is laid down as a general rule that opinions must be accompanied with the facts on which they are based — usually with the exception that expert witnesses are exempted from this rule.
"Now, in no respect is this rule sound. In the first place, then, there is no principle and no orthodox practice which requires a witness having personal observation to state in advance his observed data before he states his inferences from them; all that needs to appear in advance is that he had an opportunity to observe and did observe, whereupon it is proper for him to state his conclusions, leaving the detailed grounds to be drawn out on cross-examination. Any other rule cumbers seriously the examination, and amounts in effect to changing substantially the whole examination into avoir dire — an innovation on established methods which is unwarranted by policy."
He further says (section 675): "All opinions or conclusions are in a sense hypothetical. But does it follow that, when the opinion comes fromthe same witness who has learned the premises by actual observation, those premises must be stated beforehand, hypothetically or otherwise, by him or to him? For example, the physician is asked, `Did you examine the body?' `Yes.' `State your opinion of the cause of death.' *Page 306 
Is it here necessary that he should first state in detail the facts of his personal observation, as premises, before he can give his opinion? In academic nicety, yes; practically, no; and for the simple reason that on cross-examination each and every detail of the appearances he observed will be brought out, and thus associated with his general conclusion as the grounds for it, and the tribunal will understand that the rejection of these data will destroy the validity of his opinion. In the opposite case, where the witness has not had personal observation of the premises, they are not to be got from him on cross-examination, because he had no data of personal observation; and that is precisely the reason why they must be indicated and set out in the question to him, for thus only can the premises be clearly associated with the conclusion based upon them.
"Through failure to perceive this limitation, courts have sometimes sanctioned the requirement of an advance hypothetical statement even where the expert witness speaks from personal observation."
We are disposed to adopt the conclusions reached by Mr. Wigmore in his work on Evidence, though the numerical weight of authority may be otherwise, and a very satisfactory statement of what we conceive the law to be will be found in People v. Youngs, 151 N.Y., p. 218. There, opinion evidence of experts was received without first requiring the observations upon which such opinions were based to be given in evidence. This was affirmed on appeal, it being the subject of exception, and the reviewing Court, speaking to the question, said:
"It appears by the record that certain medical experts were called as witnesses by the prosecution, who testified that they had made a personal examination of the defendant with reference to his sanity, and were then asked whether in their opinion he was sane at the time of such examination. These questions were objected to by the defense as incompetent, but the objection was overruled, and there was an exception. It is now urged that these experts should not have been permitted to express an opinion without first stating the facts upon which such opinion was based. The testimony of experts is an exception to the general rule, which requires that the witness must state facts and not express opinions. In such cases the opinion of the witness may be based upon facts so exclusively within the domain of scientific or professional knowledge that their significance or force cannot be perceived by the jury, and it is because the facts are of such a character that they cannot be weighed or understood by the jury that the witness is permitted to give an opinion as to what they do or do not indicate. In such cases it is the opinion of the witness that is supposed to possess peculiar value for the information of the jury. Of course, all the facts or symptoms upon which the opinion is based may be drawn out also, *Page 307 
either upon the direct or cross-examinations. It is undoubtedly the better practice to require the witness to state the circumstances of his examination, and the facts, symptoms or indications upon which his conclusion is based, before giving the opinion to the jury. But we think that it is not legal error to permit a medical expert, who has made a personal examination of a patient for the purpose of determining his mental condition, to give his opinion as to that condition at the time of the examination, without in the first instance disclosing the particular facts upon which the opinion is based. The party calling the witness may undoubtedly prove the facts upon which the opinion is based, and, as we have already observed, that is doubtless the safer practice. It may also be true that the court, in the exercise of a sound discretion, may require the witness to state the facts before expressing the opinion, and in all cases the opposite party has the right to elicit the facts upon cross-examination. But the precise question here is whether the court committed an error in permitting the witness to give the opinion before the facts upon which it was founded were all disclosed, and we think that when it is shown that a medical expert has made the proper professional examination of the patient in order to ascertain the existence of some physical or mental disease, he is then qualified to express an opinion on the subject, though he may not yet have stated the scientific facts or external symptoms upon which it is based."
Applying these principles to the instant case, we think the better practice would have been for Latham and Coursey to have stated the facts or to have detailed the data observed or discovered by them, before drawing their conclusions or giving their opinions in evidence, but we shall not hold it for legal or reversible error that such was not required as a condition precedent to the admission of their opinions in evidence before the jury. S. v. Felter, 25 Ia., 75; S. v. Foote, 58 S.C. 218. Speaking to a similar question, in Commission v. Johnson, 188 Mass., p. 385, Bradley,J., said: "By this form of examination no injustice is done, for whatever reasons, even to the smallest details, that an expert may have for his opinion can be brought out fully by cross-examination."
This brings us, then, to a consideration of the defendant's second class of exceptions. On the cross-examination of the State's expert witnesses the defendant sought to show that certain notes of J. H. Hightower and H. H. Massey, the amusement company, and Mrs. C. M. Hightower, which had been listed as bad or doubtful assets, when traced back to their original entries on the books of the bank, disclosed the fact that all of these notes were substituted for notes and obligations of R. G. Allen, the former president of said bank, and that the consideration for the substitution was the transfer by Allen to Hightower and Massey, the *Page 308 
Amusement Company and Mrs. Hightower all of his holdings and interests in the bank building, the Superba Theater and the stock which he owned in the building, and that this consideration represented value sufficient to liquidate all of said notes.
The defendant further sought to show by the cross-examination of said witnesses that this transferred interest was delivered to the receivers of the bank, and by them in turn sold and conveyed to R. G. Allen upon the consideration that he pay or secure the payment of all these notes and obligations, in addition to other notes and obligations owing by him to the bank at the time of its closing; that this transaction finally secured the payment of all such notes, which at first the witnesses considered as bad or doubtful, and upon which they formed their opinions as to the insolvency of the bank; and that at all times the defendant knew of these assets behind said notes, and had reasonable ground to believe the bank to be solvent. Its insolvency was not apparent from the face of the records of the bank.
The court refused to admit any evidence relating to these transactions, and ruled that only the condition of the bank on 13 January, 1922, was to be inquired into, and that the sole question to be considered was whether or not the bank was solvent on that day. We think this ruling was erroneous and entitles the defendant to a new trial. One of the chief reasons assigned for allowing expert witnesses to give in evidence their opinions, formed from observations or investigations, without a statement of the facts upon which they are based, is that the foundation of such opinions may be fully inquired into on the cross-examination. But when this is denied, the defendant is clearly disadvantageously circumstanced before the jury. If the State is to be given the benefit of such opinions as evidence, the defendant must be allowed an opportunity to attack them, or to challenge their value and probative force.
Again, the alleged insolvency of the bank on 13 January, 1922, was not the only question to be considered, but it was further essential to inquire as to whether the defendant, president of said bank, received therein deposits, or permitted an employee to receive therein deposits, with knowledge at the time of the insolvency of such bank. The receipt of the deposits is conceded, but all knowledge of insolvency is denied. The excluded evidence was not only competent as bearing upon the alleged insolvency of the bank, but it was also material upon the question of the defendant's knowledge of such insolvency.
The word "knowledge," as used in the statute, we apprehend, is to be taken in its ordinary sense and according to its usual significance or acceptation. It means an impression of the mind, the state of being aware; and this may be acquired in numerous ways and from many sources. It is usually obtained from a variety of facts and *Page 309 
circumstances. Generally speaking, when it is said a person has knowledge of a given condition, it is meant that his relation to it, his association with it, his control over it, and his direction of it are such as to give him actual information concerning it. Parrish v. Commission, 136 Ky., p. 99.
For the purpose of ascertaining the solvency or insolvency of a bank, it is permissible to go into an investigation of its assets and property — and these words include every species of property owned by the bank — as of the date when the deposit is made, and, of course, their value after that, or at the time of the trial, is competent as illustrating or bearing upon their worth at the time charged in the bill of indictment.Parrish v. Commission, supra.
But it is contended that, notwithstanding the above ruling, the defendant was subsequently allowed the privilege of cross-examining the witness Coursey in regard to the matters originally excluded, and that for all practical purposes this evidence was before the jury. Even if this be so, it could hardly be said that a cross-examination of the witness Coursey would suffice for a cross-examination of Latham, as witness the following questions propounded to the State Bank Examiner and excluded on objection:
"Q. If you had had the same information on 13 January that you now have, would you say the bank was solvent or insolvent?
"A. That goes into another question as to the value of the assets.
"Q. On 13 January the assets as they appeared on the books?"
"Objection by State; sustained; exception."
Furthermore, in the charge no mention is made of the assets back of these alleged worthless or doubtful notes, and the jury is apparently limited to a consideration of the State's unimpeached or unquestioned opinion evidence. It would be stretching the doctrine of harmless error to an unwholesome degree to say that the jury heard and properly considered evidence which was held to be incompetent, excluded on the cross-examination of the most important witness and disregarded by the court.
But it is earnestly insisted that the present conviction should be sustained because it appears from the facts of record that the Central Bank and Trust Company was clearly insolvent on 13 January, 1922, and that the defendant must have known it. These, it should be remembered, are mooted questions of fact for the jury, and not for this Court. The defendant controverts them, and they are by no means admitted. To say that a judgment of conviction must be upheld where the defendant's case has been erroneously tried, because the record discloses an inference of guilt, is, in effect, to say that the inference is so strong as not to entitle the defendant to a jury trial at all — a proposition the bare *Page 310 
statement of which refutes itself. It is the duty of the courts to keep strict watch over fundamental rights, and to protect them in all matters presented for consideration. Those who administer the law must not forget that decided cases make precedents — precedents sometimes of little moment in themselves, but which, in their accumulated power, may in some emergency overturn basic principles and subvert the rights of those intended to be protected. S. v. Holt, 90 N.C. p. 753. A distinguished judge and law-writer, in commenting upon the excellence of trial by jury, thus points out in substance the danger to which we now advert:
"So that, the liberties of the people cannot but subsist so long as this palladium remains sacred and inviolable, not only from all open attacks (which none will be so hardy as to make), but also from all secret machinations which may sap and undermine it by introducing new arbitrary methods of trial by justices of the peace, commissioners of the revenue, and courts of conscience. And, however convenient these may appear at first (as doubtless all arbitrary powers, well executed, are the most convenient), yet let it be again remembered that delays and little inconveniences in the form of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon the sacred bulwark of the nation are fundamentally opposite to the spirit of our Constitution, and that, though begun in trifles, the precedents may gradually increase and spread, to the utter disuse of justice, in questions of the most momentous concern." 4 Bl. Com., 350.
This right of trial by jury, says Judge Story, is justly dear to the American people; it has ever been esteemed by them as a privilege of the highest and most beneficial nature. S. v. Hart, 186 N.C. p. 589.
Again, it is urged that the errors assigned by the defendant are rather technical, minute and attenuated, but we do not so understand the record. "A fair and full cross-examination of a witness upon the subject of his examination-in-chief is the absolute right, and not the mere privilege, of the party against whom he is called, and a denial of this right is a prejudicial and fatal error." Sanborn, J., in Mining Co. v. Mining Co., 129 Fed., 668. In all criminal prosecutions the defendant is clothed with a constitutional right of confrontation, and this may not be taken away any more by denying him the right to cross-examine the State's witnesses than by refusing him the right to confront his accusers and witnesses with other testimony. Constitution, Art. I, sec. 11. "We take it that the wordconfront does not simply secure to the accused the privilege of examining witnesses in his behalf, but is an affirmance of the rule of the common law that in trials by jury the witness must be present before the jury and accused, so that he may *Page 311 
be confronted; that is, put face to face." Pearson, C. J., in S. v. Thomas,64 N.C. 74. And this, of course, includes the right of cross-examination. It is fundamental with us, and expressly vouchsafed in the bill of rights that no man shall be "deprived of his life, liberty, or property but by the law of the land." Constitution, Art. I, sec. 17.
As the case goes back for another hearing, it may not be amiss to observe that the trial court charged the jury, in the language of the statute, "the term `insolvency' means when a bank cannot meet its depositary liabilities as they come due in the regular course of business," and refused to instruct them that the real test was whether the fair market value of the assets of the bank on the particular day in question was sufficient to cover its liabilities, and to pay depositors within a reasonable time, in the ordinary course of business, as is usually expected or required of banks.
The witness Coursey testified that, in his opinion, the bank was insolvent on the day named, but he also said that he did not know what was meant by "not being able to meet its depositary liabilities as they become due in the regular course of business." This he considered a relative phrase, the meaning of which was to be determined by the law of averages among banks of similar size. Inability to meet depositary liabilities "as they become due in the regular course of business" evidently does not mean a condition in which the bank could not pay all of its depositors on demand. If this be the meaning of "insolvency" under the statute, then probably every banking institution in the State is insolvent, for doubtless no one of them could presently pay all of its depositors in full. It is a matter of common knowledge that every well-managed bank seldom, if ever, has on hand an amount of money equal to its depositary liabilities. It is not expected to do so, nor is it required to anticipate that all of its depositors will want their money on the same day or at the same time. It is a legitimate feature of good banking to lend out so much of the deposits as may not be necessary to meet the demands of depositors in the ordinary and regular course of business. Such is expressly sanctioned by the statute. Section 31 provides: "Reserve. Every bank shall at all times have on hand or on deposit with approved reserved depositories instantly available funds in an amount equal to at least fifteen per cent of the aggregate amount of its demand deposits and five per cent of the aggregate amount of its time deposits. But no reserve shall be required on deposits secured by a deposit of United States bonds or the bonds of the State of North Carolina."
The statute permitting, as it does, a bank to lend out such a large amount of its deposits, it would be unreasonable to say that it must be ready at all times to pay its entire depositary liabilities on demand. *Page 312 
Speaking to this question in Parrish v. Commission, supra, Carroll, J., said: "Although the law undoubtedly contemplates that when a depositor places money in a bank as a general deposit, he shall have the right to withdraw it upon demand, and that the refusal or inability of the bank to permit him so to do would be evidence of its failing condition, it is yet manifest that the mere fact that the bank does not have in its vaults sufficient cash to satisfy all its depositors, or any considerable number of them, on the same day, or in case a run was made on the bank, would not be proof of its insolvency within the meaning of the statute. A bank might not be able to pay its depositors on demand, and yet be perfectly solvent."
The inability to meet depositary liabilities as they become due in theregular course of business, with knowledge thereof, is the point fixed by the statute beyond which the proprietors of a bank may not continue to receive deposits therein with safety to themselves. This does not mean that the officers of a bank may not persist prudently and wisely in an effort to avert a financial disaster or to tide over a temporary embarrassment, such as may arise in a time of money stringency, but it does mean that criminality will attach under the statute when any such officer or employee receives, or when any such officer permits an employee to receive, deposits therein with knowledge of the fact that, by reason of the bank's insolvency, such deposits, then being received, are taken at the expense or certain hazard of the depositors presently making them. The officers of a bank are not only trustees for the stockholders, but they are also trustees for the patrons of the bank. It is a matter of common knowledge that liquidation of a bank in insolvency proceedings is usually attended with considerable loss and depreciation of the value of its assets. So, when a banker stands face to face with a condition of probable or apparent inability to meet depositary liabilities "as they become due in the regular course of business," he knows that to go into liquidation, unless such be absolutely necessary, is inviting a greater disaster for both stockholder and depositor than to persist in going on.
Premature or unnecessary suspension is often the very worst thing that could happen to all concerned, and especially to those intended to be protected by the statute. It is necessary, therefore, and we understand such to be the purpose of the law, for officers of a bank to be permitted to exercise some judgment in determining when deposits are no longer to be received therein because of probable or apparent inability to meet depositary liabilities as they become due in the regular course of business. To hold otherwise would be to establish a rule at once hazardous to the banking business and perilous to the depositing public, and we think at variance with the intent of the Legislature. *Page 313 
To require a bank to close its doors because of inability to pay depositors on demand, and not "as they become due in the regular course of business" or as a matter of right, would make the fabled position of doubly unfortunate peril most real — the banker while bending all of his energies to avoid the danger of closing, on the one hand, would be quite likely to fall into a still greater danger for himself, on the other, by drifting into the shades of prison walls. Ellis v. State, 138 Wis. 513. But when any officer or employee of a bank receives, or, being an officer thereof, permits an employee to receive money, checks, drafts, or other property as a deposit therein, when he has knowledge that such bank is insolvent, he comes within the condemnation of the statute and must be held answerable for such conduct in a criminal prosecution. The statute was designed to protect the depositing public against this kind of practice on the part of officers and employees of banks, and they will be held to a strict accountability under its provisions when they receive or when any such officer permits an employee to receive deposits therein with knowledge of the fact that, by reason of the bank's insolvency, such deposits then being received are taken at the expense or certain peril of the depositors presently making them.
The statute must be given a reasonable construction, and it is possible that on the next trial the evidence may be such as to call for a more extended definition of "insolvency" than that contained in the statute. But we will not anticipate what questions may arise upon a full disclosure of the evidence.
Realizing the importance of this case to the banking interests of the State, as well as to the depositing public, we have given the record a most searching and critical examination. From this we are convinced that, in the interest of a fair and impartial trial, the cause must be remanded for another hearing. It is so ordered.
New trial.