IN THE SUPREME COURT OF NORTH CAROLINA

No. 31A24

Filed 12 December 2025

STATE OF NORTH CAROLINA

v.

SCOTT EVERETT FORD

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the unpublished decision of a divided panel of the Court of Appeals, 292 N.C. App. 111, 2024 WL 16286, affirming judgments entered on 1 July 2022 by Judge Alan Z. Thornburg in Superior Court, Buncombe County. On 16 October 2024, the Supreme Court allowed defendant's petition for discretionary review of an additional issue. Heard in the Supreme Court on 11 February 2025.

*Devereux & Banzhoff, PLLC, by Andrew B. Banzhoff, for defendant-appellant.*

*Jeff Jackson, Attorney General, by Brenda Menard, Special Deputy Attorney General, for the State-appellee.*

RIGGS, Justice.

In this matter, we examine whether the Court of Appeals properly affirmed the trial court's denial of defendant Scott Everett Ford's motions to dismiss two charges brought against him: felony obstruction of justice and felony cruelty to animals. The dissent below argued that the trial court erred in failing to dismiss the felony obstruction of justice charge. *State v. Ford*, 2024 WL 16286, at *10 (Carpenter, J., dissenting in part). In addition, Mr. Ford argues that the Court of Appeals erred

by applying a "should have known" standard rather than an actual knowledge standard in analyzing the trial court's denial of his motions to dismiss the felony cruelty to animals charge.

For the reasons stated below, we modify the Court of Appeals' decision to clarify that N.C.G.S. § 14-360, the statute that establishes the felony cruelty to animals offense, requires actual knowledge of the presence of an animal and not merely that the defendant "should have known" of the animal's presence. Thus, to survive a motion to dismiss, the State must present evidence that supports a reasonable inference of the defendant's actual knowledge of the animal. We otherwise affirm the Court of Appeals' holdings that the trial court did not err in denying Mr. Ford's motions to dismiss the above charges.

## I.    Factual and Procedural Background

Defendant Scott Everett Ford owns Classic Event Rental, which "set[s] up tents, tables, [and] chairs" ahead of events like weddings and festivals. The company has operated in the Asheville region for roughly twenty-one years. Mr. Ford employs about seventy people and has a fleet of sixteen to twenty trucks.

On Monday, 17 May 2021, Mr. Ford was driving one of Classic Event Rental's white Ford F-150s back from a job in Waynesville. Kelby Manos, one of his employees, was riding in the front passenger seat. Between 4:00 and 5:00 p.m., Mr. Ford stopped at the intersection near Exit 44 off I-40.

Claude "Alex" McPherson, an unhoused individual, regularly panhandled at

that spot. Mr. McPherson had a cat named Thomas. Thomas was always either on Mr. McPherson's shoulder or inside a stroller that had been given to Mr. McPherson in January 2021. The evidence at the trial court tended to show that Thomas was "a very popular character" around Asheville, with Mr. McPherson being widely known as the "Cat Man" because of Thomas.

Mr. Ford testified at trial that Mr. McPherson "mess[ed] with [him] every time [he went] through" the intersection near Exit 44. Because of this history, when he stopped at that intersection on 17 May 2021, Mr. Ford "decided to harass" Mr. McPherson and "flicked a golf ball" at him. Mr. McPherson then picked up the golf ball, and Mr. Ford—allegedly afraid that Mr. McPherson was going to break his windshield with the golf ball—drove onto the grassy lot where Mr. McPherson was and hit the stroller with Thomas inside. Mr. Manos—Mr. Ford's frontseat passenger—testified that, during the incident, he was not initially paying attention but that "the next thing I know I seen I was in a field," that he then saw "the kitty kitty," and that Mr. Ford "hit a cat stroller." Mr. Ford then drove the rest of the way back to Classic Event Rental.

Madison Stewart and Joseph Schlenk—both of whom were familiar with Mr. McPherson and Thomas—witnessed these events. Ms. Stewart filmed part of the incident. At trial, Mr. Schlenk recalled that Mr. Ford "looked really upset, mad, grimacing" as he "went straight for" Thomas's stroller.

Right after the collision, Mr. Schlenk called 911. Before Mr. Schlenk even

mentioned Thomas, the dispatcher asked, "[H]ow's the cat?" Thomas was physically unharmed but was "screaming bloody murder" and shaking. Afterward, Thomas would not willingly get in the stroller and was less friendly to strangers.

Sometime after 5:00 p.m. that same day, Officer Rebecca Williams of the Asheville Police Department called Mr. Ford and described to him both the incident and the perpetrator. Mr. Ford replied, "That doesn't sound right." When Officer Williams asked Mr. Ford "if he was going to be able to find out who was driving" the truck, he said that he "was trying his best."

The next day, Asheville police officers went to Classic Event Rental and asked for documentation to identify which employee was driving the truck involved in the collision. Mr. Ford denied that Classic Event Rental recorded that information. He also said that he "had no clue" who was driving the particular F-150, explaining that his company has so many employees that they "throw keys and tell them to go."

On 21 May 2021, Detective Adam Roach and other Asheville police officers returned to Classic Event Rental with a search warrant. Detective Roach gave Mr. Ford "one last chance" to provide "some kind of documentation" on the driver of the vehicle. Mr. Ford then led Asheville police to the "podium" at the back of Classic Event Rental's warehouse. There, the company posted spreadsheets of each day's work assignments, which included columns assigning employees and trucks.

Mr. Ford testified that the spreadsheets eventually "go in the [warehouse] recycling bin," although they sometimes "end up in the trash can." At some

unspecified time, a third-party company shreds all documents. Asheville police watched Mr. Ford go through the contents of the warehouse recycling bin, where he found "every day except for the day in question." That is, the warehouse recycling bin contained spreadsheets for the 15th, 16th, and from "the 18th on," but the spreadsheet for May 17, which Detective Roach originally requested on May 18, was missing.

As part of the search, Asheville police also seized Mr. Ford's cellphone and examined its contents. They found a digital copy of the May 17 schedule, which had the name "Mo" and "F-150" in the relevant columns.[1] The spreadsheet also had Mr. Ford's handwriting on it, which he identified at trial. The spreadsheet did not, however, contain a VIN or tag number for the assigned "F-150."

Caleb Anglin—Classic Event Rental's head of human resources—testified that he often "worked the podium" (i.e., made assignments) but that Mr. Ford "occasionally" performed that task. Mr. Anglin also testified that whoever worked the podium usually "t[ook] a picture of the spreadsheet" and uploaded it to a messaging app called Voxer.

Mr. Ford was charged with felony obstruction of justice and felony cruelty to animals, as well as related offenses not relevant to this appeal. On 7 January 2022,

---

[1] From the trial transcript, it appears that "Mo" was the nickname for an employee named Maurice Honeycutt. Law enforcement ultimately determined that Mo was not the driver. Rather, Mr. Ford was found to be the driver of the F-150 involved in the collision on the day in question.

Mr. Ford filed a motion asking, in relevant part, for the State "to prepare and file a Bill of Particulars" to "identify the specific acts which [the State] alleges constitute 'disposal' of these documents and/or information [by Mr. Ford to obstruct justice]." The trial court granted the motion, and the State prepared and filed a bill of particulars on 7 April 2022 clarifying "[t]hat the 'documentation and information' recited in the Indictment . . . is the document attached as Exhibit A, seized from a search of Defendant's phone pursuant to a search warrant" and that the document "was 'disposed' of by way of making it not available to officers who were executing a search warrant seeking said documentation and information."

At trial, Mr. Ford denied intentionally disposing of the physical copy of the May 17 schedule. He also testified that he forgot that he had taken a picture of it. Lastly, Mr. Ford stated that he did not know that Mr. McPherson was the "Cat Man" or that Thomas was in the stroller when he hit it.

Mr. Ford moved twice for the trial court to dismiss the charges against him. The trial court denied the motions both times. On 1 July 2022, a jury found Mr. Ford guilty of both felony obstruction of justice and felony cruelty to animals, as well as other offenses not at issue here. He received consecutive split sentences of four months of imprisonment and twenty-four months of supervised probation. Mr. Ford orally appealed in open court.

On 2 January 2024, the Court of Appeals issued its opinion in a divided decision, finding no error as to the trial court's rulings on Mr. Ford's motions to

dismiss. *Ford*, 2024 WL 16286, at *9–10. Regarding the obstruction of justice charge, the Court of Appeals agreed with the trial court that the evidence was sufficient for the charge to be submitted to the jury because the evidence "*could* support a reasonable inference by the jury that the defendant deliberately destroyed a document to subvert an adverse party's investigation." *Id.* at *9 (cleaned up). As to the felony cruelty to animals charge, the majority concluded that the evidence "was sufficient such that 'a reasonable mind might accept [it] as adequate to support [the] conclusion' that defendant knew or should have known that McPherson had the cat with him in the carriage." *Id.* at *6 (quoting *State v. Miller*, 363 N.C. 96, 99 (2009)).[2]

The dissent argued that the trial court erred in not dismissing the charge of felony obstruction of justice. *Id.* at *10 (Carpenter, J., dissenting in part). Specifically, the dissent would have held that dismissal of the charge would be proper based on the lack of any legal obligation for Mr. Ford to retain the spreadsheet in question. The dissent emphasized the disposal of the spreadsheet "was consistent with his regular business practice" and "law enforcement [actually] obtained a copy of the spreadsheet while executing the first and only search warrant appearing in the record." *Id.*

Mr. Ford appealed pursuant to N.C.G.S. § 7A-30(2) based on the dissent's

---

[2] The Court of Appeals also addressed an additional issue regarding special jury instructions. Mr. Ford argued that the trial court erred by denying his request for a jury instruction incorporating the common law definition of torture into the pattern jury instructions for the offense of animal cruelty. *Ford*, 2024 WL 16286, at *7. The Court of Appeals rejected Mr. Ford's argument and held that the specific definition of torture provided by the animal cruelty statute controls. *Id.* That issue is not before us on appeal here.

arguments that the obstruction of justice charge should have been dismissed.[3] This Court further allowed discretionary review pursuant to N.C.G.S. § 7A-31 on the felony cruelty to animals charge on the issue of whether the requirement in N.C.G.S. § 14-360(b) that a defendant act "intentionally" and "knowingly" required the State to prove actual information or knowledge of the presence of an animal.

More specifically, Mr. Ford argues to this Court that the Court of Appeals erred by concluding that Mr. Ford obstructed justice by "disposing" of a document when that document was electronically retained pursuant to the company's standard procedures and was retrieved electronically by law enforcement. He further argues that the Court of Appeals erred by failing to apply the proper standard in evaluating the sufficiency of the evidence for the felony cruelty to animals charge because that court's use of the "should have known" standard is inconsistent with the requirement that the State prove the defendant acted "intentionally" and "knowingly."

For the reasons set forth below, we affirm the Court of Appeals' decision in that the Court of Appeals did not err in concluding that the State presented substantial evidence of both charges. Nonetheless, while we agree with the Court of Appeals' result, we disagree with the Court of Appeals' analysis regarding the felony cruelty to animals charge and modify it as addressed below. While the Court of Appeals erred

---

[3] N.C.G.S. § 7A-30(2) (2023) provided a right of appeal when there is a dissent at the Court of Appeals and was repealed by the Current Operations Appropriations Act of 2023, S.L. 2023-134, § 16.21(d), 2023 N.C. Sess. Laws 760, 1171. The right of appeal based on a dissent was still in effect at the time Mr. Ford's notice of appeal was filed.

in its invocation of the "should have known" language in its analysis, the State's evidence was sufficient to support a reasonable inference that Mr. Ford had actual knowledge that Thomas the cat was in the stroller at the time of the incident.

## II.    Analysis

### A. Standard of Review

Both issues in this matter stem from the trial court's denial of Mr. Ford's motions to dismiss the obstruction of justice and cruelty to animals charges. "Whether the State presented substantial evidence of each essential element of the offense[s] is a question of law; therefore, we review the denial of a motion to dismiss de novo." *State v. Chekanow*, 370 N.C. 488, 492 (2018)) (quoting *State v. Crockett*, 368 N.C. 717, 720 (2016)).

In ruling on a motion to dismiss, the trial court's task is to decide "whether there is substantial evidence (1) of each essential element of the offense charged . . . and (2) of [the] defendant[ ] being the perpetrator of such offense." *State v. Powell*, 299 N.C. 95, 98 (1980).  The evidence is "substantial" if it is "relevant and adequate to convince a reasonable mind to accept a conclusion." *State v. Parker*, 354 N.C. 268, 278 (2001).  But if the evidence merely raises "a suspicion or conjecture," the trial court must grant the motion to dismiss. *State v. Malloy*, 309 N.C. 176, 179 (1983).  What matters is the sufficiency, not the weight, of the evidence presented. *State v. Fritsch*, 351 N.C. 373, 379 (2000).

In deciding whether the evidence presented is substantial, the trial court must

view the evidence "in the light most favorable to the State, giving the State the benefit of all reasonable inferences in the State's favor." *Id.* at 378–79 (citing *State v. Benson*, 331 N.C. 537, 544 (1992)). Any contradictions or conflicts in the evidence must be resolved in the State's favor. *Miller*, 363 N.C. at 98.

As long as the evidence presented ultimately supports a reasonable inference of the defendant's guilt, the trial court should deny the motion to dismiss, regardless of whether the evidence also permits a reasonable inference of the defendant's innocence. *State v. Butler*, 356 N.C. 141, 145 (2002). This standard applies even when the evidence presented is mostly or totally circumstantial. *Fritsch*, 351 N.C. at 379.

## B. The Motions to Dismiss the Obstruction of Justice Charge

The Court of Appeals held that the trial court did not err in finding that the State had presented sufficient evidence of the destruction of the May 17 schedule to send the charge of felony obstruction of justice to the jury. *Ford*, 2024 WL 16286, at *7, 9. Mr. Ford, in agreement with the dissent, contends on appeal that the Court of Appeals erred by concluding that the State had presented sufficient evidence for the trial court to submit this charge to the jury. Mr. Ford contends that the Court of Appeals erred on that grounds that (1) schedules were routinely discarded in the normal course of business and (2) the schedule was successfully retrieved by law enforcement—arguing essentially that the May 17 schedule was not "disposed of"

within the meaning of the statute. We disagree with Mr. Ford and affirm the Court of Appeals' decision.

Common-law obstruction of justice "take[s] a variety of forms." *In re Kivett*, 309 N.C. 635, 670 (1983) (quoting 67 C.J.S. *Obstructing Justice* §§ 1–2 (1978)). Most often, however, this Court has defined the offense as "any act which prevents, obstructs, impedes or hinders public or legal justice." *State v. Bradsher*, 382 N.C. 656, 659 (2022) (quoting *Kivett*, 309 N.C. at 670). When "done with deceit and intent to defraud," obstruction of justice is a felony. *Id.* (quoting N.C.G.S. § 14-3(b) (2021) (governing "Punishment of misdemeanors, infamous offenses, offenses committed in secrecy and malice, or with deceit and intent to defraud, or with ethnic animosity")); *see also State v. Ditenhafer*, 373 N.C. 116, 128 (2019).

An obstruction charge addresses "direct or indirect opposition or resistance to [an officer's] lawful discharge of his official duty." *State v. Estes*, 185 N.C. 752, 755 (1923); *see also Obstruction*, *Black's Law Dictionary* (12th ed. 2024) (defining "obstruction" as "the act of impeding or hindering something"). Disposal—that is, destruction—of a document sought by law enforcement can certainly constitute obstruction of justice. *See Henry v. Deen*, 310 N.C. 75, 87 (1984) (acknowledging that the plaintiff's allegations that the defendants acted to destroy or conceal certain records "if found to have occurred, would be acts which . . . would amount to the common law offense of obstructing public justice"). However, "success" is not an element of the offense. *See, e.g., Kivett*, 309 N.C. at 670 ("[T]he *attempt* to prevent

the convening of the grand jury would support a charge of common law obstruction of justice." (emphasis added)); *Henry*, 310 N.C. at 88 (finding obstruction "[w]here . . . a party deliberately destroys, alters or creates a false document to subvert an adverse party's investigation" without a requirement that the party succeed in doing so).

**i.    Existence of a business practice does not foreclose the possibility of obstruction of justice.**

Mr. Ford argues that he was charged with "disposing" of a document that was routinely discarded in the normal course of business.  In doing so, Mr. Ford asserts that the obstruction of justice charge requires evidence of *intentional* obstruction.  He argues that here, the State presented evidence that only supports an inference of Mr. Ford's adherence to a regular business practice that was not limited by any law or regulation requiring retention.

This argument lacks merit because the existence of a  regular business practice of disposing of the spreadsheets does not foreclose the possibility that Mr. Ford intentionally obstructed justice by destroying the document or hindering its discovery.  *See Butler* 356 N.C. at 145 (noting that when the evidence supports an inference of guilt, the motion to dismiss should be denied even if the evidence also permits a reasonable inference of innocence).  The evidence offered by the State tends to show that, even if the physical copy of the May 17 schedule was discarded via a regular business practice, the copy would still be accessible as long as it remained in the warehouse recycling bin.  Asheville police managed to recover schedules for "every single day [of the target week] consecutively except for May 17th."  Thus, the fact that

Classic Event Rental had a regular business practice of disposing of the physical schedules does not, in and of itself, explain why only the physical copy of the May 17 schedule was missing when law enforcement initially requested the documentation and then physically searched for it. That the recycling bin contained spreadsheets for "the 18th on" supports an inference that someone disposed of the physical copy of the May 17 schedule *irregularly*—that is, that someone took additional, atypical steps to prevent Asheville police officers from obtaining a document they otherwise would have found in searching the warehouse recycling bin.

Furthermore, the State offered compelling circumstantial evidence that could support an inference that Mr. Ford disposed of the May 17 schedule in an effort to obstruct police efforts. Notably, Mr. Ford worked the podium on that date and thus had access to the physical copy of that schedule. Asheville police asked Mr. Ford about documentation of employee use of company trucks and he misled them by denying that such records existed, insisting that he "had no clue" who was driving the truck and had so many employees that he just "thr[e]w keys and t[old] them to go." When presented with a search warrant, Mr. Ford led law enforcement to the warehouse recycling bin, and police found that the bin contained spreadsheets for "every single day consecutively except for May 17th." Finally, Mr. Ford knew, and eyewitness testimony supports, that Mr. Ford was the driver who hit the stroller.

Therefore, when taken together and viewed in the light most favorable to the State, these facts support several reasonable inferences. From the evidence, a jury

could reasonably infer that someone intentionally removed the physical copy of the May 17 schedule from the recycling bin, given that the bin contained spreadsheets for every other day of that week. A jury could further reasonably infer from the State's evidence that Mr. Ford, the driver of the vehicle in the collision, was the party that actually removed the May 17 schedule shortly before or during law enforcement's investigation. Thus, the State presented substantial evidence to support a conclusion that Mr. Ford disposed of the physical copy of the May 17 schedule irregularly to obstruct law enforcement's investigation of the collision in which he hit the stroller.

### ii. The success of a defendant's obstruction of justice efforts is not an element of the offense.

Mr. Ford also contends that the Court of Appeals erred in affirming the trial court's denial of his motion to dismiss the obstruction of justice charge because the May 17 schedule was found by law enforcement. He contends that the Court of Appeals' decision conflicts with the rule that common-law obstruction of justice requires that the act be done to "impair the verity or availability" of evidence at judicial proceedings for which he relies primarily on *State v. Eastman*, 113 N.C. App. 347, 353 (1994) for this argument.[4] Mr. Ford argues he cannot be guilty of obstruction because there was no impairment of the verity or availability of the May 17 schedule,

---

[4] Mr. Ford only appears to cite to *Eastman* because of the quotation included above and the fact that the documents in *Eastman* were completely destroyed. *See Eastman*, 113 N.C. App. at 353. The common-law obstruction of justice issue in *Eastman*, however, was different from the one presented here. In *Eastman*, the court acknowledged the destruction of the documents in question but was only concerned with the issue of whether the defendant had the specific intent to impede a criminal investigation. *Id.* at 353.

given that a digital copy of the May 17 schedule was in fact found by law enforcement and admitted into evidence at trial. We disagree with Mr. Ford's interpretation that total effective obstruction of the availability of a document is necessary to support an obstruction of justice charge.

Mr. Ford's narrow reading of *Eastman*'s language is not consistent with this Court's recitation of the elements of obstruction of justice in other cases. This Court has defined the offense as "any act which prevents, obstructs, impedes or hinders public or legal justice." *Bradsher*, 382 N.C. at 659 (quoting *Kivett*, 309 N.C. at 670). A plain reading of that definition is that obstruction of justice merely requires a showing that a defendant acts to stymie law enforcement's progress or otherwise stall an investigation of a matter. The success of a defendant's obstruction efforts is not an element of the offense. *See, e.g.*, *Kivett*, 309 N.C. at 670. For example, in *Kivett,* the Judicial Standards Commission investigated a superior court judge, Charles Kivett, for his unethical relationship with a local bail bondsman. *Id.* at 639–40. Worried that the district attorney "was going to present a bill of indictment" against him, Kivett implored a colleague, Judge Albright, "to enter a restraining order to prevent the grand jury from convening." *Id.* at 642. Judge Albright refused and promptly informed the Administrative Office of the Courts of the conversation. *Id.* On appeal, this Court concluded that the evidence of Kivett's solicitation of interference "clearly and convincingly prove[d] an attempt . . . to obstruct justice" and therefore "would support a charge of common-law obstruction of justice." *Id.* at 670.

In sum, viewed in the light most favorable to the State, the evidence here supports a reasonable inference that Mr. Ford disposed of the physical copy of the May 17 schedule irregularly to obstruct law enforcement's investigation. While officers eventually recovered a digital copy of the May 17 schedule, the act of making the physical copy unavailable is sufficient to support the charge. The defendant in *Kivett* did not succeed in his obstruction, but the evidence of his efforts was enough to support the obstruction of justice charge. The same result must follow here.

## C. The Motions to Dismiss the Cruelty to Animals Charge

The Court of Appeals held that the State presented sufficient evidence for the trial court to submit the felony cruelty to animals charge to the jury. *Ford*, 2024 WL 16286, at \*3, \*6. In doing so, the Court of Appeals misstated that the evidence "was sufficient such that 'a reasonable mind might accept [it] as adequate to support [the] conclusion' that defendant *knew or should have known* that McPherson had the cat with him in the carriage." *Id.* at \*6 (emphasis added) (quoting *Miller*, 363 N.C. at 99). Mr. Ford contends on appeal that the Court of Appeals erred by applying the wrong standard to the "intent" element of the cruelty to animals charge.

For reasons set forth below, we agree with Mr. Ford that the Court of Appeals erred in using "should have known" language because the statute requires actual knowledge. *See* N.C.G.S. § 14-360(b)–(c) (2023) (requiring that a defendant acted "maliciously," thus "intentionally" and "knowingly"). Notwithstanding that misstatement, the Court of Appeals' ultimate conclusion is still correct because the

State presented sufficient evidence for the jury to reasonably infer that Mr. Ford actually knew Thomas was in the stroller at the time of the incident. Thus, while we affirm the Court of Appeals' conclusion that the State presented sufficient evidence of this charge, we modify the Court of Appeals' decision to clarify that actual knowledge is required to meet the "intent" element of N.C.G.S. § 14-360(b).

Under N.C.G.S. § 14-360(b), a person is guilty of felony cruelty to animals if he "shall maliciously torture, mutilate, maim, cruelly beat, disfigure, poison, or kill . . . any animal." "[M]aliciously" means "an act committed intentionally and with malice or bad motive." N.C.G.S. § 14-360(c). In turn, "intentionally" means "committed knowingly and without justifiable excuse." *Id.* Because malice and intent are seldom proved with direct evidence, both are "ordinarily proven by circumstantial evidence from which [they] may be inferred." *State v. Sexton*, 357 N.C. 235, 238 (2003). As commonly defined, "knowingly" entails actual knowledge. *See State v. Hightower*, 187 N.C. 300, 308–09 (1924) ("[W]hen it is said a person has knowledge of a given condition, it is meant that his relation to it, his association with it, his control over it, and his direction of it are such as to give him *actual information* concerning it." (emphasis added)). As such, the Court of Appeals erred in using the phrase "should have known" because, under N.C.G.S. § 14-360(b), the State needed to present substantial evidence that Mr. Ford had *actual knowledge* that Thomas was in the stroller at the time of the incident.

But while the Court of Appeals erred in its language, the Court of Appeals did not err in holding that the trial court properly denied Mr. Ford's motions to dismiss. The State presented substantial evidence in the form of circumstantial evidence that Mr. Ford knew that Thomas was in the stroller when he hit it with Classic Event Rental's truck. Thus, for purposes of the motion to dismiss stage, the State presented sufficient evidence of the "intent" element of the charge of felony cruelty to animals.

The State's circumstantial evidence, from Mr. Ford's own testimony to the testimony of other witnesses, supports an inference that Mr. Ford had actual knowledge of Thomas's whereabouts at the time of the incident. The State's evidence indicates that Mr. Ford owned and operated Classic Event Rental in Asheville for over twenty years. The State's evidence further suggests that Mr. McPherson had a community-wide reputation as the "Cat Man," with Thomas usually either on his shoulder or in the stroller. Finally, the State established that Mr. Ford and Mr. McPherson had repeated interactions, with Mr. Ford testifying that "[y]ou mess with me every time I go through [the intersection] asking for money, whatever it might be." Turning to the day of the incident, Mr. Ford testified at trial that he could not say exactly when he learned about the cat and that he did not know that there was a cat in the stroller. But, Mr. Manos, Mr. Ford's front-seat passenger, testified that he was not initially paying attention but when he looked up he saw "the kitty kitty." Moreover, Mr. Schlenk, an eyewitness to the incident, testified that Mr. Ford "looked really upset, mad, grimacing" and "went straight for the baby carriage."

Considered together, and viewing the evidence in the light most favorable to the State, the evidence supports a reasonable inference that Mr. Ford knew and bore animus toward Mr. McPherson and, based on this relationship, knew of Thomas, given that Thomas was frequently with Mr. McPherson. The evidence also supports the inference that Thomas was plainly visible to Mr. Ford during the incident given Thomas's plain visibility to Mr. Manos as a passenger in the same vehicle. The State's evidence supports the reasonable inferences that Mr. Ford had a lengthy and adversarial relationship with Mr. McPherson, and that, on the day in question, Mr. Ford intended to hit Mr. McPherson's stroller, and he did so knowing that Thomas was in it. Therefore, the State presented sufficient evidence of the elements of the felony cruelty to animals offense, and we affirm the Court of Appeals' conclusion that the trial court did not err in denying Mr. Ford's motions to dismiss this charge.

Mr. Ford argues that the State is misusing "information known to other witnesses" to "imply that Mr. Ford should have seen [Thomas]." That assertion is misguided because, while Mr. McPherson's and Thomas's widespread community recognition made it more likely that Mr. Ford knew that Thomas was in the stroller, as discussed above, the State's evidence was more encompassing than just the common knowledge of Thomas in the community. In particular, when viewed in the light most favorable to the State, the evidence that the cat was always with Mr. McPherson, that Mr. Manos saw the cat on the day in question, and that Mr. Ford testified that he had repeated irritating and direct interactions with Mr. McPherson

at that particular intersection can reasonably support an inference that Mr. Ford knew the cat was in the stroller when he struck it.

In sum, we clarify that the State was required to present evidence of Mr. Ford's actual knowledge of Thomas's presence in accord with N.C.G.S. § 14-360(b), and, despite the Court of Appeals' use of language indicating a different standard, the State did provide sufficient evidence that Mr. Ford actually knew of Thomas's presence at the time of the incident. Thus, we affirm the Court of Appeals' holding as modified herein.

### III. Conclusion

We affirm the Court of Appeals' ultimate conclusions that the State presented sufficient evidence of both charges to withstand motions to dismiss; however, while we agree with those conclusions, we clarify and modify the Court of Appeals' sufficiency of the evidence analysis relating to the felony cruelty to animals charge.

MODIFIED AND AFFIRMED.

Justice BERGER concurring.

I concur with the majority but write separately to clarify the burden required of the State to survive a motion to dismiss for insufficient evidence. This has apparently been the source of some confusion recently given exchanges on the subject in recent oral arguments and as highlighted by this opinion.

When ruling on a motion to dismiss, the trial court must determine whether the State presented sufficient evidence for jury consideration. "If there is more than a scintilla of competent evidence to support the allegations in the warrant or indictment, it is the court's duty to submit the case to the jury." *State v. Horner*, 248 N.C. 342, 344–45 (1958). At this stage, the evidence is viewed in the light most favorable to the State, and it is entitled to every reasonable inference which can be drawn from that evidence. *State v. Barnes*, 334 N.C. 67, 75 (1993). "Contradictions or conflicts in the evidence are resolved in favor of the State, and evidence unfavorable to the State is not considered." *State v. Miller*, 363 N.C. 96, 98 (2009) (citations omitted). In other words, the "more than a scintilla of evidence" standard is not a high bar.

But word choice can control outcomes, and shifting the vocabulary may alter interpretation. Our case law has also stated that the burden on the State to survive a motion to dismiss is the production of "substantial evidence." *See State v. Scott*, 356

N.C. 591, 597–98 (2002).  A casual reader of the law might reasonably think that this is a higher bar.

But "[s]ubstantial evidence means 'more than a scintilla of evidence.' " *State v. Beck*, 385 N.C. 435, 438 (2023) (quoting *State v. Powell*, 299 N.C. 95, 99 (1980)); *see also State v. Gillard*, 386 N.C. 797, 832 (2024) ("The terms 'more than a scintilla of evidence' and 'substantial evidence' are in reality the same . . . ." (quoting *State v. Earnhardt*, 307 N.C. 62, 66 (1982))); *State v. Dover*, 381 N.C. 535, 547 (2022) ("Substantial evidence only requires 'more than a scintilla of evidence . . . .' " (quoting *Earnhardt*, 307 N.C. at 66)).

Even though these two phrases are synonymous, the "more than a scintilla of evidence" standard is probably the more accurate framing given the low bar. Practitioners and judges alike should be mindful that, regardless of which phrase is used, the burden on the State remains the same.

Although this is a recurring issue which I will certainly address again, I will not belabor the point every time it comes up.  Yes, we should insist on a consistent articulation of the standard, but there is no need to use more toner and ink on something that should already be clear.